Joe Bill WHITE and Midwestern Insurance Company, Plaintiffs in Error,

v.

Gordon McDONALD, Defendant in Error.

No. 41759.

Supreme Court of Oklahoma.

Dec. 3, 1968.

Loyd Benefield, John A. Johnson, of Savage, Gibson, Benefield & Shelton, Oklahoma City, for plaintiffs in error.

James E. Driscoll, Seminole, R. Kay Matthews, Atoka, for defendant in error.

BLACKBIRD, Justice.

The defendant in error (hereinafter referred to as "plaintiff") was injured when the truck in which he was riding with plaintiff in error, Joe Bill White, (hereinafter referred to as "defendant") a commercial trucker, who owned and was driving it, skidded on a highway near Altoona, Kansas, and turned over while hauling a load of corn from Conrad, Iowa, destined for Atoka, Oklahoma. The trip originated four days before in Atoka, where both plaintiff and defendant resided, and had been friends for years. Plaintiff was not then employed, but had previously owned a truck and had been in the trucking business himself.

In his petition in the present action, instituted approximately a year later to recov-

er damages for his personal injuries, on account of defendant's alleged negligent operation of the truck, plaintiff alleged, among other things in substance, that the trip was for defendant's sole and exclusive benefit, and that, when plaintiff agreed to accompany him on it, defendant agreed to pay all of his expenses, in return for plaintiff's services in assisting defendant with the driving, which plaintiff did, in addition to performing other services. Plaintiff's petition described various injuries to his brain, back, and nervous system, from which he was allegedly permanently disabled, and sought damages in the following items: A total of $347.35 for past medical and hospital bills, $1,000.00 for future expenses, $10,000.00 for pain and suffering, and $25,000.00 for reduction in earning capacity.

Defendant's answer contained a qualified general denial, a special denial that plaintiff was his employee on the trip, and an allegation that plaintiff went along on the trip to become familiar with new equipment defendant had recently purchased. Defendant also alleged that plaintiff was his guest at the time of the accident, and further alleged that, under the Kansas Guest Statute, G.S., 1949, § 8–122b, plaintiff had no cause of action. Defendant also pleaded, in substance, plaintiff's contributory negligence in allegedly failing to warn him (as the truck's driver) and to use ordinary and reasonable care for his own safety, " * * * under the circumstances then and there existing."

In plaintiff's reply, he denied that he was defendant's "guest" under the above cited Kansas Statute, and set forth other allegations unnecessary to mention.

At the trial to the court, after waiver of trial by jury, the evidence showed that defendant (with one possible exception) paid the expenses of the trip, which included bills for plaintiff's lodging and meals, and that plaintiff did part of the truck's driving, and helped with its loading and unloading. It was on the basis of this, and other evidence, that the court ruled (as hereinafter more fully described) that,

while on the subject trip, plaintiff was a passenger for hire, rather than a "guest", within the meaning of the above cited Kansas statute, which reads as follows:

"That no person who is transported by the owner or operator of a motor vehicle, as his guest *without payment for such transportation,* shall have a cause of action for damages against such owner or operator for injury, death or damage, unless such injury, death or damage shall have resulted from the gross and wanton negligence of the operator of such motor vehicle." (Emphasis added).

The judgment which the trial court thereafter rendered in plaintiff's favor for the sum of $22,143.00 in damages contained, among others, findings that, at the time and place of the accident, plaintiff was defendant's passenger; that said passenger's carriage promoted the mutual interest of both passenger and driver, but was primarily to serve the driver's purposes; that the action is controlled by Kansas statute and decisions, but that the above quoted Kansas "Guest Statute" was not applicable "in view of the identity and relationship of the parties; the circumstances of the transportation; the nature and type of benefits resulting to the respective parties growing out of the transportation and the tangible benefits to the driver defendant herein." The court concluded, among other things, that the relationship of employer and employee did not exist between the plaintiff and defendant, that the Kansas Guest Statute was not available to defendant as a defense, and that:

"3. * * * *the trip* out of which this accident arose *was for the sole and exclusive benefit of the defendant,* * * * that the benefits, services and advantages resulting to defendant * * * *constituted a tangible benefit sufficient to entitle Gordon McDonald, to the status of a passenger for hire sufficient to exclude his classification as a guest."* (Emphasis added).

After the overruling of his motion for a new trial, defendant perfected the present appeal.

His arguments for reversal of the trial court's judgment are advanced under two propositions. Under the first one, he attempts to demonstrate error in said court's ruling that plaintiff was not his "guest", under the above quoted Kansas statute. Defendant first refers to the undisputed testimony showing that before he telephoned plaintiff on the morning of September 22, (approximately a week before the accident) to see if he would accompany him on the trip originating at Atoka that afternoon (and extending to points in Texas, before being continued into Iowa and other northern States) defendant had made arrangements to trade his truck, in which the trip was commenced, for another one (the "new equipment" referred to in defendant's answer) and was committed to an arrangement to consummate the transaction at Wichita Falls, Texas, where he was to accept delivery of the newer one, to haul commodities to and between points farther north. Continuing his argument, defendant refers to excerpts from the testimony of both plaintiff and defendant, as indicating that the parties had no agreement, before they left Atoka, that defendant would pay plaintiff "any compensation" for helping him with the driving, or the loading, or unloading, of either of the two trucks. He points to portions of the record as showing that defendant had to, and would have, made the trip, even if plaintiff had not accompanied him on it, that (contrary to the allegations of plaintiff's petition) the parties had no agreement (at least before starting the trip) about any kind of "payment", or consideration, passing between them for plaintiff's transportation, that would indicate plaintiff was anything but defendant's "guest" under the above-quoted statute. Defense counsel point to portions of the parties' testimony and suggest that the reason plaintiff accepted defendant's invitation to accompany him on the trip was that the two had been close friends for years, that plaintiff was then temporarily unemployed and had nothing better to do, than go, and that, either because plaintiff had formerly been a trucker himself, and/or

was considering the purchase of a truck and resuming the trucking business, himself, he was interested in seeing how defendant's new truck drove, or operated.

In defendant's argument he quotes, among other cases, Broadwater v. Coleman, 10th Cir., 224 F.2d 186, citing opinions of the Kansas Supreme Court, such as Bedenbender v. Walls, 177 Kan. 531, 280 P.2d 630. The quoted United States Circuit Court opinion recognizes that the "compensation" that the passenger pays the automobile operator need not be in money; but defendant argues, in effect, that the proof fails to show that plaintiff's helping him with the driving, and the loading and unloading of the truck, was defendant's motive for inviting him to go on the trip. According to defendant's argument, the parties' long friendship and plaintiff's failure to show that any promise, or agreement by plaintiff to assist defendant in this work, or any promise, or agreement, by defendant, to compensate plaintiff therefor by paying for his meals and lodging on the trip (and perhaps, in addition, to let him see how the truck operated) preponderated against plaintiff's being a passenger for hire, and placed him in the same category as any passenger who accepts a ride-offer motivated solely by the car owner's hospitality or social amenity.

We think it unnecessary to further describe defendant's extensive argument, or to answer it, in any more detail than to point out that he failed to challenge the sufficiency of the evidence as a whole— and after the testimony of the last witness, and before the case was submitted to the trier of the facts. Where this is the situation in a jury-waived action of legal cognizance, such as the present one, it is not the function of this court on appeal to weigh the evidence, or to determine in which direction the evidence preponderates. In such a case, the trial judge is substituted for the jury, as the trier of facts, and our review of his judgment extends no further (assuming that plaintiff has proved a prima facie case) than to determine whether, or not, there is any competent evidence, including reasonable inferences, to

support it. See Missouri National Life Insurance Co. v. Mead, Okl., 393 P.2d 521; Western Steel Erection Co. v. Gatlin, Okl., 319 P.2d 607, with New York Life Ins. Co. v. Razzook, 178 Okl. 57, 61 P.2d 686, 788, quoted therein, and Richardson v. Shaw, Okl., 313 P.2d 520, 522. In our opinion, it was not necessary for plaintiff, in order to make a prima facie case, to show that defendant would not have made the trip, if he had not agreed to accompany him on it, or to show that the parties had an express contract, or agreement, before the trip started, that plaintiff would do part of the work connected with the trip, as "payment", or compensation, for his transportation, meals and lodging. In Ehrsam v. Borgen, 185 Kan. 776, 347 P.2d 260, 264, it was said:

"In order to take a person riding in an automobile out of the guest status, *it is not necessary that compensation for the ride be a strict contractual consideration or that an enforceable contract relation relative to the ride should exist between the parties. Where the trip is not purely social any substantial benefit to the owner or operator of the automobile is sufficient to take the case out of the statute.* * * *." (Emphasis added).

See also 8 Am.Jur.2d, "Automobiles and Highway Traffic", § 478, at footnote 10. Here, there is no doubt that the parties' trip was not "purely social", and, though we recognize that there was no proof of any formal contract that plaintiff would help defendant with the driving, and other work connected with the trip, in return for defendant's taking him along and paying his expenses, defendant, on cross examination, admitted that "it was more or less kinda agreed, taken for granted" that if defendant needed help on the trip, such as with changing a tire, or spelling him off in the driving, plaintiff would furnish such help; and, though defendant testified that he could have made the trip by himself, he admitted that it would have taken longer, if plaintiff had not gone along and helped him, as he did. As already indicated, we have not weighed the evidence, nor decided therefrom whether, or not, it was sufficient to show the correctness of the trial court's determination on all of the questions involved and adjudicated by his judgment, such as: Whether the trip was for the parties' equal or mutual benefit, or whether plaintiff's help or assistance, to defendant was the chief motivating cause for his being transported in defendant's truck. In this connection, notice Wills et ux v. Buchanan (Tex.Civ.App.) 358 S.W.2d 727. All we do here is answer, in the affirmative, the only complaint that defendant can urge concerning the sufficiency of the evidence, and that is: Is there any competent evidence, including inferences that might reasonably be drawn therefrom, to support the trial court's judgment?

Under his second proposition, defendant argues that the amount of damages awarded plaintiff by the trial court's judgment was grossly excessive. To support this argument, he first attempts to minimize plaintiff's injuries and to cast doubt upon plaintiff's entitlement to any damages for present and future pain and suffering, and also for permanent disability, by charging that plaintiff neither testified to any pain from the particular injuries he suffered in this accident, nor introduced any credible expert testimony that he did.

Defense counsel's argument is somewhat facilitated by the confusion that may naturally arise from the fact that the evidence concerning injuries is interspersed with evidence concerning injuries he suffered in an accident in California more than two years previous to this one. It is therefore deemed advisable to briefly advert to plaintiff's medical history.

Since birth, or adolescence, plaintiff has had a mild kyphosis which was described in the medical testimony as an abnormal curvature of the spine, from which he developed a "stooped-shoulder" posture. While he was a truck driver and engaged in felling trees in California, during April, 1959, one of the trees struck him and knocked him to the ground severely injuring his back. According to the history he related to one of his Oklahoma doctors, this injury affected his spine, shoulder blades,

and left shoulder and arm, and he suffered pain in the lower neck, upper back, left shoulder and arm, and he complained of numbness in the left hand, forearm and neck, as well as nervousness and frequent headaches. After a slow, but steady, recovery, he returned to truck driving about two years before the accident involved here. When this accident occurred on September 30th, 1962, he was taken to the emergency room of a hospital in Fredonia, Kansas, where he was attended by a Dr. S of that City.

Dr. S testified that plaintiff was then conscious, oriented and responsive to questions; that he was "complaining of rather severe pain in the back and obviously did have pain in his back * * *". Dr. S also testified that "he had a laceration over his forehead and some abrasions of his face; * * *". This doctor further testified that his examination of plaintiff "revealed marked tenderness over his lumbar spine." Dr. S further testified that four X-ray pictures of plaintiff's back were taken under his direction; and he identified three of them as revealing a compression fracture of the first lumbar vertebrae. As to the treatment given plaintiff in Fredonia, Dr. S testified that his laceration was sutured, and his stitches later removed. He further testified concerning plaintiff's treatment:

> "Because of his marked pain and rather severe muscle spasms we placed him in bed rest and then placed him in hypertension position with a body pack, and kept him in this position for several days until part of his acute spasm was relieved and part of his pain subsided. When we thought he was able to stand the procedure, we had him placed in a hypertension cast. In a few days he was allowed to be up."

Dr. S further testified that the cast extended "from up toward his neck" down to his pubic area, and all around his body "mainly to give him support to his spine and keep him in a hypertension position." Dr. S further testified that plaintiff wanted to leave the Fredonia hospital before he thought advisable, but that he required him to stay there until he was satisfied that he was able to travel; and that on October 4th (1962) he was released, and his "local doctor did the follow-up treatment."

Plaintiff wore his cast until about a week before he saw his local physician, Dr. H (who had been practicing in Atoka two years) for an examination on December 21st. At that time, plaintiff was wearing "a small back brace, a corset type affair * * *" about six inches wide around his lumbar and sacral area. Plaintiff is still under Dr. H's observation, having been seen by him last, only two days before the trial.

Dr. H had his technician take four X-ray pictures of plaintiff. This doctor's examination of these pictures confirmed Dr. S's diagnosis of plaintiff's condition, which Dr. H referred to as "the compressive fracture of L–1". He testified that, when the compression and the fracture occurred, the "intervertebral disc was somewhat flattened * * *" though the pictures revealed "no neurological evidence of protrusion of the disc into the spinal cord." A further portion of Dr. H's testimony is as follows:

"Q Alright now doctor, when you examined and treated this man were you able to discern whether or not there was any pain objective or subjectively?

"A Subjectively there was a great deal of pain, objectively there was a great deal of tenderness.

"Q What would tenderness indicate?

"A Actually that is the objective counterpart of pain.

"Q Where was this point of sensitivity?

"A Approximately at L–1 and the interspace below.

"Q Do you have an opinion doctor as to whether that pain is temporary or permanent?

"A I believe it will be permanent."

Dr. H further testified that he considers plaintiff's type of fracture "a serious thing", and that he felt certain it is disabling to

plaintiff. When asked what, if anything, can be done to alleviate plaintiff's condition, he stated that he didn't believe any kind of surgical procedure would help him, because the fracture was higher than most, and he had made very little improvement in the seven or eight months since it occurred. When asked in what way plaintiff will be permanently disabled, Dr. H stated: "Well, in lifting, working with his body muscles, he will never do this again for the rest of his life." This doctor further testified that he advised plaintiff that he should not drive; and revealed that he did not know plaintiff had recently been driving a truck. When asked, on cross examination for the basis of his conclusion, that plaintiff is disabled from his "second injury" (the one involved here) Dr. H testified that, according to a letter and records he received from the doctor who had attended plaintiff following his first, or "California", injury, that injury "was limited mainly to the upper portion of the spine and not to the area surrounding the 1st lumbar area, and his symptoms were referable to up high, rather than down low." Dr. H's cross examination then continued as follows:

"Q Is it your conclusion that all this disability to which you now testify is from the low back area or the lumbar area, or more specifically from the compression of the first lumbar?

"A All that we have discussed thus far.

"Q And that is what you base your opinion on that this man is disabled?

"A I did not say that alone, but this is certainly what I base the majority of it on.

"Q Could you evaluate then what you base it upon in addition to that?

"A Well he certainly has some degree of disability subjective at least in the cervical region and upper thoracic; I cannot objectively demonstrate this to my satisfaction, but subjectively they are there.

"Q Is it true that what you are saying to the court is that he complains of pain in his upper thoracic area, but you as a physician cannot find evidence of it?

"A No pain.

"Q What about limitation?

"A It's strictly numbness located over the upper thoracic area; I cannot demonstrate it objectively.

"Q Then whatever injury he complains of in that area, you are depending upon what he says, rather than what you as a doctor know?

"A That's true.

"Q Then are you attributing a part of that injury, which you cannot demonstrate, that he is disabled?

"A I think this is shown, in addition to the other, as far as I am concerned the lumbar injury is enough to qualify the percentage of disability I demonstrated awhile ago.

 * * * * * *

"Q Then it's only where the thoracic attached to the lumbar that you found any trauma?

"A That I found any trauma results, this is the only definite thing.

 * * * * * * ."

At the trial, plaintiff testified that he recovered from his previous California accident sufficiently to work, but that he still "had some headaches and my neck would hurt." As to the pain plaintiff now suffers, he testified: "My head hurts, my neck hurts, and my left arm plumb down to my fingers." Besides attempting to discredit Dr. H's testimony as proof that plaintiff now suffers any pain from the compression fracture he received in the Kansas accident here involved, defendant calls our attention to the fact that plaintiff testified to no pain in the lumbar, or low back region, and he argues: "Even where a party does testify to pain * * *, there must be expert testimony of at least 'reasonable certainty' that past pain existed and that there will be pain in the future, or

the proof of such an item of damages is insufficient; Shawnee-Tecumseh Traction Co. v. Griggs, 50 Okl. 566, 151 P. 230, 233." This strongly infers that plaintiff introduced no expert medical testimony to show that the pain he now suffers is the result of his back injury in the subject accident; but, in his argument, defendant wholly omits any reference to the testimony of Dr. R, a specialist in bone and joint surgery, at an Ada clinic and hospital, who testified that he examined plaintiff on September 3rd, a few days before the trial. In relating the history and complaints plaintiff made to him, this doctor testified that plaintiff told him (among other things) that his left arm gave him trouble when he used it excessively, or tried to steer a truck with it alone, and that for this reason "he preferred to favor (it) and did so whenever possible, because of pain; he said he had difficulty when forced to use that arm where a great deal of shifting must be done." Dr. R testified in great detail as to the examination he made, aided by X-ray pictures he took, and their comparison with plaintiff's earlier pictures. Portions of this doctor's testimony pertinent to defendant's complaint that plaintiff's difficulties are not related to his lumbar region, are as follows:

"Q And by your X-rays showing the same area coupled with the history you had, what is your finding relative to that area?

"A I found the compression fracture noted on the Kansas X-rays had healed completely as far as bony pathology is concerned. There is still some compression, but then that is the general rule.

\* \* \* \* \* \*

"Q Do you have an opinion as to whether this back is still in its healing process?

"A The bony portion of Mr. McDonald's spine has completed its healing process, however, from a functional point of view that the function of Mr. McDonald's spine in general will continue to improve *for quite a substantial length of time* in the future.

\* \* \* \* \* \*

"Q And am I to understand that if we submitted this man to the *(deleted)* Clinic under your care that you could snap him out of it and put him back to work?

"A No, I did not say that or imply that; as we know from previous history he had a similar injury in a spot which really gives less trouble in this regard, the upper part, and for which a great deal of treatment was given, it took two years to recover; now there is an explanation for that in my opinion and that is with the condition of epiphysitis and difficulty before he was full-grown that leaves a back which is not really normal and kyphosis occurs then and there is considerably extra curvature which I mentioned in the neck and lower back which Mr. McDonald definitely shows and has always shown since he has been a full-grown man, and if not injured he stays in a physical condition to get along very well but once he becomes injured, recovery is sometimes quite difficult and may very well be incomplete as a result of the spine not being normal to start with.

\* \* \* \* \* \*

"Q The sum and substance of what you are telling us about a man's future being improved is with regard to a man of a pretty strong constitution is it not?

"A Well I think we will have to admit he healed rather slowly the first time for the reasons that I have given you in my explanation for that particular part of it, but I think that he still may be very well slower for which there are many reasons for that too, but I still feel that *he has by no means completed the functional recovery* which he will make in this second accident as we say.

"Q Is that unusual that a bony pathology does not alleviate itself by callous formation within a year?

"A Well the bony part of it is not the whole story; there is ligament and muscle function. The ligaments become stiff and if you have it in a case, or even if you do not and do not use them, then all that has to be regained by exercise and as normal use as possible following the period of pain and demobilization.

\* \* \* \* \* \*

"Q And he complains of the index finger and up the arm and the cervical area?

"A Yes, when he over-uses his left arm he stated that occurred.

"Q Is that not consistent with the occurrence back in the California accident?

"A Yes, it is.

"Q And we have a period where by the grace of God, or something, those signs went away and *are going on up into the cervical area?*

"A Yes.

"Q *And then came this traumatic episode, and from his history there has been a reoccurrence?*

"A Yes, there has.

"Q Doctor, is there *anyway* you can tell the amount of damage done to that area in the nature of a re-occurrence, and whether the previous disability, on percentages, could be attributed to the first injury?

"A *No, there really is not a good way to tell.*

"Q And actually there is not much treatment you can give a compression fracture?

"A No, especially at the stage we are in now.

\* \* \* \* \* \*

"Q I think you found this old compression fracture for that area giving him trouble now?

"A *I relate at least part of this trouble he is having with his arm to that area,* yes.

"Q And *trauma can aggravate it* can it not?

"A Yes, certainly.

"Q That is just accepted medical phenomenon?

"A Yes.

\* \* \* \* \* \*

"Q Is it your recommendation or would it be if you were his attending physician, that he continue to perform his duties as a truck driver?

"A Yes, *with the limitations* I have indicated; its probable that certain types of truck driving, if he is required to load or unload, or if his truck was extremely difficult to manage, he might, at least at the present time, find that to be beyond his physical power.

"Q Since he has, as you know, been driving a truck of some sort prior to your examination, do you find it has been good rather than to the contrary?

"A I can only go by what he told me; he indicated that during this month of truck driving he did not notice any worsening and as long as there is no worsening I would expect him to improve by such performance.

"Q Assuming there is a fracture of one of the lumbar vertebrae as in this case, and normal treatment or activity such as indicated and recognized as standard by the American Medical Association were given, do you have an opinion as to the percentage of disability?

"A Yes, there is a set figure by the disability examination committee which is the same for all vertebrae, which I do not really agree with, but it is standard as a base for the certain percentage of disability.

"Q And what is that?

"A That is eight percent. \* \* \*." (Emphasis added).

From the above it will be seen that *there was* expert medical testimony (contrary to the inferences in defendant's brief) that the pains which plaintiff has suffered and continues to suffer, although in the region of the neck, arm and head, are definitely related to his injury in the lumbar region. Though, as the evidence indicates, plaintiff's difficulties may be due, partially at least, to the Kansas accident's aggravation of the old injuries plaintiff suffered in the California accident, defendant makes no effort to refute plaintiff's arguments, supported by citations, that this fact does not relieve defendant from liability for his present damages.

 Nor do we think the fact that plaintiff may have been driving a truck for an Atoka establishment during several months leading up to the trial, or that he may be earning more wages, from such employment, than he was earning from truck driving during some time previous to the accident, establishes that the trial court's judgment was so excessive as to shock the conscience of this Court, or to indicate it was rendered as a result of passion or prejudice on the part of the trial judge. The evidence does not disclose whether the trucking work referred to is lighter, or more strenuous, than his previous trucking, but it does show that, because of plaintiff's disability, his activities in this line of work are limited, and, if not restricted, can be, and have been, painful. We think plaintiff's situation, according to the evidence, is somewhat similar to that of the plaintiff in Chicago, Rock Island & Pac. R. Co. v. Hawes, Okl., 424 P.2d 6, in which the defendant advanced similar arguments (424 P.2d p. 15) and we affirmed a general verdict for the plaintiff of $30,-000.00. Furthermore, since the judgment is not itemized so as to reveal the amount of the trial court's allowance for each item of plaintiff's claimed damages, which included those for pain and suffering (that have no fixed standard of measurement) we cannot determine that the judgment was excessive. Notice Kansas City Southern Railway Co. v. Johnston, Okl., 429 P.2d

720, 731. As defendant has demonstrated no error, or ground for a new trial, in the trial of this case, there is no warrant, or justification, for a remittitur, as sought by defendant, even if there was any way this court could fix an amount therefor. As to the latter, notice Chicago, Rock Island & Pac. R. Co. v. Hawes, supra, and St. Louis, S. F. Ry. Co. v. Tompkins, Okl., 409 P.2d 1, 6.

In accord with the foregoing, the judgment of the trial court is hereby affirmed.

JACKSON, C. J., and DAVISON, WILLIAMS, BERRY, HODGES, LAVENDER and McINERNEY, JJ., concur.

IRWIN, V. C. J., concurs in result.