1997 OK 58

**Delbert CURRENS and Brenda Currens, co-personal representatives of the Estate of Jennifer Currens, deceased, Appellees,**

v.

**Robert HAMPTON, M.D., C.D. Cook, M.D., and Eastern Oklahoma Medical Center, Appellants,**

No. 85887.

Supreme Court of Oklahoma.

May 6, 1997.

As Corrected Aug. 21, 1997.

Michael D. Parks, Parks & Wiley, P.C., McAlester, for Appellees.

Joseph A. Sharp, John H.T. Sheridan, Karen M. Grundy, Catherine L. Campbell, Best, Sharp, Holden, Sheridan, Best & Sullivan, Tulsa, for Appellants.

ALMA WILSON, Justice.

¶ 1 The appellees, Brenda Currens and Delbert Currens, sued the appellants, Dr. Robert Hampton, Dr. C.D. Cook, and Eastern Oklahoma Medical Center, for the wrongful death of the Currens' minor child, Jennifer. The parties presented their evidence at trial, and the jury returned a verdict for the appellees in the amount of $1,500,000.00. The trial court denied the appellants' motion for a new trial. After the appellants filed their petition in error, the medical center settled with the appellees. The Court of Civil Appeals, in addressing the issues presented by the appellants, found the closing argument of appellees' counsel so inflammatory as to substantially influence the verdict, resulting in excessive damages, and ordered either a remittitur of $500,000.00 or a new trial. The appellees petitioned for certiorari, which this Court has previously granted. We vacate the portion of the opinion of the Court of Civil Appeals ordering remittitur, and affirm the judgment of the trial court.

¶ 2 The rule concerning conduct of counsel is found in *Middlebrook v. Imler, Tenny & Kugler, M.D.'S,* 713 P.2d 572, 584 (Okla.1985). Conduct of counsel is a matter left to the discretion of the trial court. Improper conduct is not ordinarily grounds for reversal unless it substantially influences the verdict or denies the defendant a fair trial. That determination is a fact to be decided by the trial court, and the appellate court will not reverse that determination unless it clearly appears that the verdict was so influenced, considering all pertinent facts and circumstances from the record.

¶ 3 The remarks cited by appellants as incurable error occurred during the last minute of appellees' closing argument, in reply to the argument of defense counsel. Appellees' counsel had argued the grievous nature of the loss of Jennifer to Mr. and Mrs. Currens. Counsel for the doctors, in his argument, stated that Job had lost all of his children, every one of them, and said, "the Lord giveth and the Lord taketh away. Blessed be the name of the Lord." Counsel continued that when King David lost his baby, he said, I can't bring him back, but I can go to him. Counsel for the doctors concluded those remarks by saying, "I tell you something, members of the jury, that should be the goal for every one of us. That should be where we claim to go to see our loved ones, to see others."

¶ 4 Then the argument of appellees' counsel in rebuttal, to which counsel for the doctors objected, was:

"You know, I can see the defense team in this case, if you come back with a defense verdict, I can see them, you know, leaving LeFlore County on their way back to Tulsa and, you know, thinking, well, we've done it again, we've brought in our slick witnesses who've testified and, you know, we've tricked another jury. I can just see them thinking that."

The trial court overruled the objection. Appellees' counsel continued in his rebuttal by informing the jury that his statements were not evidence.

¶ 5 The appellants moved for a new trial. The appellants asserted in their motion, that the closing argument was incurably prejudicial, resulted in a verdict for excessive damages, and mandated a new trial. The trial court denied the motion. Pursuant to *Middlebrook,* the trial court's denial of the motion for new trial is an implicit fact determination that the conduct of appellees' counsel neither substantially influenced the verdict, nor denied the appellants a fair trial.

¶ 6 On appeal, the appellants made the same argument, asserting that the comments of appellees' counsel mandated reversal of the trial court. The Court of Civil Appeals determined that there was sufficient evidence of negligence to support the verdict in favor of the appellees, but that the remark of appellees' counsel was egregious enough to warrant either remittitur of one-third of the verdict, or a new trial. The Court of Civil Appeals found that the argument directly affected the size of the verdict awarded, in other words, that the award was excessive based on the evidence.

¶ 7 This Court has in the past ordered new trials or remittitur when the court determined the judgments were excessive. In *St. Louis–San Francisco Railway v. Kilgore,* 366 P.2d 936 (Okla.1961), the plaintiff was awarded $35,000 in a personal injury action as a result of a train-automobile collision. The defendants contended that the verdict was excessive and the result of passion and prejudice. The defendants argued that the judgment should be vacated and a new trial ordered. They further contended that where a verdict is excessive, reversal of the action and ordering a new trial was the only remedy open to the appellate court, that giving the plaintiff the alternative of filing a remittitur in a definite amount and affirming the action was not proper. This Court could not sustain that theory. *Kilgore,* 366 P.2d at 941. After a review of the facts including the evidence on damages, this Court concluded that the jury had been motivated by prejudice and passion and found the defendants were entitled to a new trial unless the plaintiff filed a remittitur of the amount in excess of $25,000. *Kilgore,* 366 P.2d at 942. Because of the advanced age of the plaintiff, and what the Court characterized as a satisfactory recovery, the Court determined that $23,500 of the $35,000 award would have had

to be attributable to pain and suffering and permanent injury. The Court concluded that verdict was excessive. The Court cited *Public Service Co. of Oklahoma v. Hawkins,* 194 Okla. 272, 149 P.2d 783, 784 (1944) for the rule that this Court will not disturb a verdict on the grounds that it is excessive unless the jury has committed some gross and palpable error, or acted under bias, influence, or prejudice, or has totally ignored the rule of law by which damages are awarded. The *Hawkins* case continued that when the amount of damages awarded is so excessive as to indicate that the jury was actuated by bias, prejudice, or passion, it is the duty of this Court to hold the verdict excessive and to remand the cause with directions to vacate the judgment and grant a new trial unless the plaintiff files a proper remittitur. *Hawkins,* 149 P.2d at 790.

¶ 8 In *White v. McDonald,* 447 P.2d 746 (Okla.1968), the plaintiff was injured while a passenger in a truck in which he was riding with the defendant. The case was tried to the court, which rendered judgment in plaintiff's favor in the amount of $22,143.00, less than the $36,347.35 sought by the plaintiff. The defendant argued on appeal that the trial court's judgment was grossly excessive. After a review of the evidence, the Court found that evidence did not establish that the trial court's judgment was so excessive as to shock the conscience of this Court, or to indicate it was rendered as a result of passion or prejudice on the part of the trial judge. *White,* 447 P.2d at 755. The Court reasoned that since the judgment was not itemized to reveal the amount of the trial court's allowance for each item of plaintiff's claimed damages, which included those for pain and suffering, the Court could not determine that the judgment was excessive. The Court parenthetically noted that damages for pain and suffering have no fixed standard of measurement. *White,* 447 P.2d at 755. The Court held that the defendant had demonstrated no error, or ground for a new trial, nor justification for a remittitur. *White,* 447 P.2d at 755.

¶ 9 We have held that a trial court may not sit as a thirteenth juror in substituting its opinion concerning the reasonableness of the amount of damages set by a jury after it reached its verdict. *Dodson v. Henderson Properties,* 708 P.2d 1064, 1068 (Okla.1985). In *Dodson,* we reasoned that if a trial court were permitted unbridled prerogative to substitute its opinion for that of a jury, it would partially abrogate the right to trial by jury. If a trial court may not substitute its opinion, certainly an appellate court cannot do so. The trial court has heard the evidence and observed the witnesses. The appellate court has no such advantage.

¶ 10 We have traditionally held that an appellate court has no right to place a limitation on the amount of a jury verdict unless it is convinced that the amount bears no relation whatsoever to the evidence. The established rule is that before a verdict of a jury may be set aside as excessive, it must appear that the verdict is so excessive as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous, showing the jury to have been actuated by passion, partiality, prejudice or corruption. *Denco Bus Lines v. Hargis,* 204 Okla. 339, 229 P.2d 560, 562–563 (1951). Given the nature of damages for wrongful death, if the amount awarded is not flagrantly outrageous and extravagant, the court cannot undertake to draw a line at a certain amount since the court cannot ascertain the excess. An appellate court may not substitute its judgment for that of the jury in its exercise as a fact-finding body; it must consider the evidence most favorable to the plaintiffs as establishing the facts concerning the excessiveness of the verdict. *Denco,* 229 P.2d at 563. But in order to determine whether the verdict bears any relationship to the evidence, we must look at the evidence.

¶ 11 The evidence shows that on Monday morning, October 26, 1987, eleven-year-old Jennifer Currens was taken to her family physician, Dr. Cook, because she had been sick since Friday, with vomiting and diarrhea. He ordered that she be admitted to the medical center, where she was given intravenous fluids for severe dehydration. On Monday evening, Dr. Hampton, a surgeon, examined Jennifer, at the request of Dr. Cook. Dr. Hampton told Mr. and Mrs.

Currens that he did not believe that Jennifer had appendicitis. Another physician, a kidney doctor, also examined her, but found no reason to be concerned with her kidneys at the time.

¶ 12 Through Monday night and into Tuesday Jennifer did not sleep well. Her previous symptoms continued, she was curled up in pain, crying, and unable to eat or drink any liquids. Dr. Cook examined her again on Tuesday morning. By noon her abdomen began to swell to the point that she could no longer wear her underwear. Her vomit began to contain streaks of blood, and her condition worsened throughout the day. Despite reassurances from the nurses, Mr. Currens, after viewing his daughter's worsening condition, after midnight, began to insist that the nurses bring in another doctor to examine Jennifer. The emergency room doctor came in about 4:30 a.m., and after his examination told a nurse to contact Dr. Hampton immediately, and have Mr. Currens sign a consent to do exploratory surgery on Jennifer. By the time she left for surgery, Mr. Currens testified that her stomach resembled that of a woman who was five or six months pregnant.

¶ 13 Dr. Hampton arrived about 5:30 a.m., Wednesday, October 28, and preparations for surgery continued. At 6:45, in the operating room, nurse anesthetist Andrew Hamilton began the medications necessary to render Jennifer unconscious. As her eyes closed, she vomited. The evidence is conflicting concerning whether she aspirated some of the vomit. Nurse Hamilton suctioned her throat, irrigated the area with saline solution, and suctioned that out as well. The subsequent operation proved that Jennifer had a ruptured appendix with generalized peritonitis, and an abscess in her abdomen.

¶ 14 Following surgery, Jennifer initially felt better, but during the day her pulse continued between 150–160 beats per minute, and her respiration went from 26 breaths per minute in the morning to 64 by 9:30 Wednesday evening. Her father testified that she was breathing so hard by 9:30 that she was shaking the bed. Again Mr. Currens questioned the nurses, and like before, they reassured him that her fast pulse and rapid breathing were the result of the day's surgery. Jennifer was given pain medication. But after midnight, Thursday morning, Mr. Currens testified that she was moaning, tossing and turning in her bed. She was only able to speak in mumbles, and could not carry on a coherent conversation. About 3:00 a.m., Jennifer started to cough, Mr. Currens put his hand behind her back to help her but she became limp in his arms.

¶ 15 The hospital records reveal that her blood pressure started dropping, breathing stopped, and "Code Blue" medical procedures began, lasting until about 5:00 a.m. at which time Jennifer was pronounced dead. X-rays taken during the emergency procedures revealed that her lungs had filled with fluid. Dr. Hampton's discharge summary lists the final diagnosis as (1) Perforated appendix with abscess and generalized peritonitis, (2) Aspiration pneumonitis, and (3) Cardiac arrest. The report of the physicians involved also suggested the possibility of a pulmonary embolus from the pelvic veins adjacent to the large pelvic abscess.

¶ 16 The jury trial lasted seven days. The appellees contended that Jennifer died because the doctors involved misdiagnosed appendicitis as gastroenteritis, failed to timely perform surgery, failed to minimize or eliminate the risk that Jennifer would aspirate gastric contents during induction of anesthesia, and failed to monitor her after surgery when the acids of the gastric content were causing damage to her lungs, resulting in death. All three doctors who testified for the appellees suggested specific ways in which Doctors Hampton and Cook, and the nurses failed to maintain the standard of care required by their training. They concluded that Jennifer's death was preventable. The experts and witnesses for the defense suggested Jennifer's death was caused suddenly when a massive blood clot reached her lungs. The verdict reveals that the jury accepted the theory of the appellees.

■ ¶ 17 Both Mr. and Mrs. Currens testified to the loss of companionship and love for Jennifer, and the effects of the destruction of the parent-child relationship. Both had suffered from grief and had used professional help in order to receive some relief from

their sense of loss. Both testified concerning Jennifer's suffering before her death. Mr. Currens testified that Jennifer's funeral bill was $2,245.00. He identified a bill for her headstone, which was entered as an exhibit, in the amount of $452.40. Mr. Currens estimated that he had spent about $100 per month on her support.

¶ 18 The trial court in its instructions to the jury enumerated the items the jury was entitled to consider in awarding damages to the Currens. The court instructed that in determining the amount of damages the Currens were entitled to recover, the jury could consider the following items: (A) The medical and burial expenses; (B) Loss by the parents of anticipated services and support; (C) Loss by the parents of companionship and love of the child; (D) Destruction of the parent-child relationship; (E) Loss of monies expended by the parents in the support, maintenance and education of Jennifer Currens; (F) The grief experienced by Brenda Currens and Delbert Currens due to the death of their daughter; and (G) The conscious pain and suffering of Jennifer Currens before her death. The instruction reflects the items set as damages recoverable in actions for wrongful death in 12 O.S.1991, §§ 1053 and 1055. The trial court also instructed upon the life expectancy of Mr. and Mrs. Currens. In his closing argument, counsel for the Currens argued to the jury for an award of $1,000,000.00 to Mr. Currens and $1,000,000.00 to Mrs. Currens. The jury awarded $750,000.00 each.

¶ 19 Although appellees' counsel argued for a total of $2,000,000.00, the trial court determined that the jury award was $1,500,-000.00, $750,000.00 to each. The trial court was in a better position to determine the relation of the verdict to the evidence, and denied appellants' motion for a new trial. We have previously upheld an order of a trial court, which found a verdict to be excessive. *Wells v. Max T. Morgan Co.,* 205 Okla. 166, 236 P.2d 488 (1951). In *Wells,* the trial court found that the minds of the jurors had been inflamed by some inconsistent testimony. The trial court ordered remittitur or new trial. The plaintiff refused remittitur. Upon appellate review, this Court found that the

record supported the trial court in its observations. In the case at bar, the amount of the verdict was within the limits of the evidence. We have also held that we will not invade the jury's province and substitute our judgment as a fact finding tribunal. *Bane v. Anderson, Bryant & Co.,* 786 P.2d 1230, 1236 (Okla.1989).

¶ 20 Although, under the rules cited above, remittutur is an alternative to a new trial, an appellate court may not superimpose its own damages over that of a jury. In the case at bar, we find that the evidence supports the trial court's denial of a new trial. Accordingly, the portion of the opinion of the Court of Civil Appeals ordering remittitur or a new trial is VACATED, and the judgment of the trial court is AFFIRMED.

¶ 21 KAUGER, C.J., and HODGES, LAVENDER, SIMMS, HARGRAVE, OPALA and WATT, JJ., concur.

¶ 22 SUMMERS, V.C.J., concurs in judgment.