2006 OK CIV APP 118

The ESTATE OF Jonathon KING; Mark King, and Carol Stockham, individually and as survivors and next of kin to Jonathon King, deceased, Plaintiffs/Appellees,

v.

WAGONER COUNTY BOARD OF COUNTY COMMISSIONERS, Defendant/Appellant/Appellee,

and

KTUL, L.L.C., Defendant/Appellant/Appellee.

Nos. 100,814, 101,114.

Court of Civil Appeals of Oklahoma, Division No. 2.

July 25, 2006.

Certiorari Denied Oct. 16, 2006.

Tim K. Baker, Kristi L. Hazen, Tim K. Baker and Associates, Tahlequah, OK, for Plaintiffs.

Barry K. Roberts, Norman, OK, Jerry S. Moore, Tahlequah, OK, for Defendant Wagoner County.

Eugene Robinson, The Robinson Law Firm, P.C., Tulsa, OK, for Defendant KTUL.

Opinion by JANE P. WISEMAN, Presiding Judge.

¶1 In this action for wrongful death resulting from a fall from a communications tower, Defendant Wagoner County Board of County Commissioners appeals a judgment of indemnity rendered against it and in favor of Defendant KTUL, L.L.C., and a partial summary adjudication determining it was acting as the agent of KTUL. KTUL likewise appeals the finding of an agency relationship, as well as admission of expert testimony, denial of its motion for a directed verdict, denial of its request to submit to the jury the issue of a third party's negligence, submission of punitive damages, and denial of indemnity for its own negligence and certain attorney fees. Having reviewed the record and applicable law, we affirm in part and reverse in part.

## FACTS AND PROCEDURAL BACKGROUND

¶2 KTUL leased a portion of its broadcast transmission tower to Wagoner County, whose sheriff's department placed on the tower a metal cabinet which holds radio communications equipment. On October 16, 2001, two deputy sheriffs climbed the tower to remove part of the equipment for repair. Because they did not have a key to access the locked cabinet, one of the deputies used a screwdriver to pry the door off the cabinet. When the deputies were finished, they replaced the door. The next day, S & K Structural Services was performing repair work on the tower for KTUL. Jonathon King (Decedent), an employee of S & K, was killed when the door came off the Wagoner County cabinet and knocked him from the tower.

¶3 Decedent's estate and his parents (Plaintiffs) filed a wrongful death suit against Wagoner County and KTUL. KTUL filed a crossclaim against Wagoner County seeking indemnity under a provision in the lease agreement.

¶4 The trial court granted summary judgment in favor of Wagoner County and against Plaintiffs on the ground that Wagoner County is exempt from liability under the Governmental Tort Claims Act.[1] The court also granted summary judgment to KTUL on its crossclaim for indemnity against Wagoner County. Based on the lease agreement between KTUL and Wagoner County, the court also determined as a matter of law that Wagoner County was acting as the agent of KTUL and, therefore, any negligence by Wagoner County would be imputed to KTUL.

¶5 In the first stage of the jury trial, the jury determined that Decedent was 10% contributorily negligent, KTUL was 10% negligent, and Wagoner County was 80% negligent. The jury fixed compensatory damages at $500,000. The trial court also submitted the issue of punitive damages to the jury, instructing the jury that it was to determine whether Wagoner County (not KTUL) acted with reckless disregard, and informing the jury that KTUL would be held liable for any punitive damages award because Wagoner County's actions were the responsibility of

1. Wagoner County argued that it is exempt from liability because Decedent's death was a loss covered by workers' compensation, 51 O.S. Rev. Supp.2005 § 155(14); the death related to a "method of providing police, law enforcement or fire protection," 51 O.S. Rev. Supp.2005 § 155(6); and Wagoner County's act of repairing its equipment was a discretionary function, 51 O.S. Rev. Supp.2005 § 155(5). In granting summary judgment to Wagoner County, the trial court did not specify on which exemption it relied. This adjudication by the trial court was not appealed. Although § 155 has been amended since the trial court granted summary judgment, the substantive portions relied on by Wagoner County remain unchanged.

KTUL. The jury awarded $40,000 in punitive damages.

¶ 6 The trial court, pursuant to its summary judgment rulings and the jury's verdict, entered judgment in favor of Plaintiffs and against KTUL for $50,000 for its own negligence, $400,000 for Wagoner County's negligence, and $40,000 for punitive damages due to Wagoner County's actions, plus costs and interest. The court also entered judgment in favor of KTUL against Wagoner County for indemnity for damages related to Wagoner County's actions, ordering Wagoner County to indemnify KTUL in the amount of $487,845.26. The court denied KTUL's request for indemnification from Wagoner County for KTUL's own negligence.

¶ 7 The trial court also held that KTUL is entitled to indemnity for the attorney fees it had incurred before the summary judgment on its indemnification claim and before Wagoner County began providing a defense to KTUL. The court denied KTUL's request for fees it incurred for continued representation by its own counsel after Wagoner County began providing KTUL a defense, concluding that the continued representation "was at the expense of KTUL ... and should not be assessed against Wagoner County pursuant to the terms of the indemnity provision."

¶ 8 Wagoner County appeals the trial court's findings that KTUL is entitled to indemnity under the lease agreement and that there was an agency relationship between Wagoner County and KTUL. KTUL also appeals the trial court's ruling on agency, as well as rulings regarding punitive damages, admission of expert testimony, negligence of Decedent's employer, indemnity for its own negligence and for a portion of its attorney fees, and denial of its motion for directed verdict.

### WAGONER COUNTY'S APPEAL

*A. Indemnity for Wagoner County's Negligence*

¶ 9 To determine the issue of indemnity, it is necessary to analyze the lease agreement between KTUL and Wagoner County. Wagoner County leased from KTUL floor space in the transmitter building, tower space, and ground space for installation and use of Wagoner County's equipment.

¶ 10 Section 5 of the lease, entitled "Installation," states that "[d]uring installation and operation of its Equipment, [Wagoner County] shall not cause by its transmissions or its other activities on the Leased Property, interference of any kind whatsoever to the broadcasting activities or other communication facilities of [KTUL] or other lessees on the Tower." It requires Wagoner County to install the equipment "in a neat, workmanshiplike [*sic*] manner in accordance with standards of good engineering practice" and to keep the equipment "in a locked cabinet provided by [Wagoner County] so as to be rendered inaccessible to unauthorized persons."

¶ 11 In Section 13, entitled "Maintenance of Leased Property," Wagoner County is obligated to maintain its own property "in accordance with standards of good engineering practice to assure that at all times, [Wagoner County's] Equipment is in conformance with the requirements of the FCC and all other government bodies or agencies with jurisdiction over [Wagoner County]." And, in Section 14, "Alteration by Lessee," Wagoner County is allowed to perform changes or alterations to its equipment, as long as the changes conform to "standards of good engineering practice" and are "done in a neat, workmanshiplike manner." [2]

¶ 12 Section 11, entitled "Indemnification," provides as follows:

[Wagoner County] shall indemnify and defend [KTUL] against any claim for damages, liability, costs, or expenses, including attorney's fees, *arising out of any breach by [Wagoner County] of its warranties, representations, or covenants under this Lease;* provided, however, that [KTUL] shall provide [Wagoner County] with reasonably prompt written notice of any claim for which indemnification is sought and

---

**2.** Section 14 states that changes and alterations must conform to "the provisions of Section 5," which includes the "workmanshiplike" standard.

[Wagoner County] shall have the right and opportunity to undertake the legal defense of such claims. [KTUL] and its counsel may nevertheless participate in (but not control) such proceedings, negotiations or defense at its own expense.... (Emphasis added.)

¶ 13 Wagoner County argues that the lease's indemnity agreement does not encompass indemnity for tort liability, because the "warranties, representations, or covenants," as referred to in the indemnity clause, "are intended to protect the 'main purpose' of the leased facility—the broadcast tower—which is the commercial broadcast of radio signals." The language of the lease, according to Wagoner County's argument, creates an agreement to indemnify against a "loss in conjunction with KTUL's broadcasting business," not an agreement to indemnify against tort liability.

¶ 14 As with other contracts, the cardinal rule in the interpretation of an indemnity contract is to "ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles." *McAtee v. Wes–Lee Corp.*, 1977 OK 130, ¶ 6, 566 P.2d 442, 444 (quoting *Clifford v. United States Fid. & Guar. Co.*, 1926 OK 564, ¶ 0, 119 Okla. 133, 249 P. 938, 938 (syllabus by the Court)). The intention of the parties should be derived from the whole contract, with particular clauses of a contract being subordinate to the general intent; and every part of a contract should be given effect, "each clause helping to interpret the others." 15 O.S.2001 §§ 157, 166; *Wallace v. Sherwood Const. Co.*, 1994 OK CIV APP 82, 877 P.2d 632. Although the terms of a contract may be broad, "it extends only to those things concerning which it appears that the parties intended to contract." 15 O.S.2001 § 164. "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." 15 O.S.2001 § 163.

¶ 15 Viewing the lease agreement as a whole, we find that the agreement is not limited to indemnity for damages resulting from interference with the broadcasting tower, but it also includes indemnity against damages arising from tort. The indemnity clause provides that Wagoner County will indemnify and defend KTUL against claims for damages or liability "arising out of any breach by [Wagoner County] of its *warranties, representations, or covenants* under this Lease." (Emphasis added.) Wagoner County's warranties, representations, and covenants under the lease in part concern installation, operation, maintenance, and alteration of the equipment that it placed on KTUL's tower.

¶ 16 The lease requires Wagoner County to install its equipment in "a neat, workmanshiplike manner" and to keep it "in a locked cabinet." The lease also requires Wagoner County to install and maintain its property "in accordance with standards of good engineering practice." Similar to installation and maintenance, alterations and changes must be performed "in conformance with standards of good engineering practice." Generally speaking, the lease requires Wagoner County to conduct "installation, maintenance, repair, replacement, alteration, use and operation of its Equipment ... in accordance ... with any activities of [KTUL] on the Leased Property."

¶ 17 It is clear from the record that Wagoner County breached its "warranties, representations, or covenants" when it attempted to repair its equipment. Dale Rhinehart, deputy sheriff for Wagoner County at the time of the accident, testified that he ascended the tower to remove equipment that needed to be repaired. He had no training either on how to access a tower or on tower safety. When he got to the tower, S & K was working on the tower and he had to wait two to three hours for S & K to finish.

¶ 18 When Rhinehart got to the box where the equipment was held, he realized he needed a key to unlock the box; he tried to locate the key, but no one knew where it was. He then decided to try to drill the lock out of the box, but was unable to do so because the battery on his drill quickly died. Although he thought drilling was the best way to get into the box, he decided not to go back down the tower to get a new battery. Rather, he decided to remove the door, which required him "[t]o go from the bottom of the door and

then lift the tongues up and slide the bottom of the door out." He knew this would require him to bend the door. When he first replaced the door, it stayed in place, but he was not satisfied because it did not fit as tightly as he wanted it to. He put it back in place again and was convinced it was tight. He did not attempt, however, to further secure it by taping, wiring, or tying it on. He admitted that he either had to securely replace the door or bring it back down the tower.

¶ 19 Nathan Shipman, also a deputy sheriff, went up the tower with Rhinehart. He also had no training in accessing a tower or in tower safety. He admitted that in removing the door, he and Rhinehart may have bent the metal at both the top and the bottom. He admitted that the door might have lost some of its strength because of the pressure they put on it. He also confirmed Rhinehart's testimony that the door was still loose when they first put it on; he could not say what they did differently when they put it on the second time.

¶ 20 Rhinehart and Shipman's method of removing and replacing the door cannot be viewed as complying with the standards of "a workmanshiplike manner" or "good engineering practices," nor can it be viewed as not interfering with KTUL's use of the tower. This is especially true in light of certain facts, such as the location of the box and the equipment (hundreds of feet in the air), the weight of the door (approximately 200 to 300 pounds), the presence of workmen from S & K on the day that Wagoner County removed the door, the failure to attach the door more securely after it had obviously been bent during its removal, and the inconsistency of wind speeds on a tower of this height. Prying a 200 to 300–pound door off a box located hundreds of feet in the air and simply replacing it without any sort of reinforcement cannot be viewed as maintaining, installing, or altering the box in a workmanshiplike manner or in compliance with good engineering practices.

¶ 21 The contract makes Wagoner County liable for indemnity to KTUL for claims arising out of Wagoner County's breach of warranties, representations, or covenants concerning installation, operation, maintenance, and alteration of the equipment that it placed on KTUL's tower. Plaintiffs' claim arises out of the breach of these warranties; therefore, the trial court did not err in determining that Wagoner County was obligated to defend and indemnify KTUL.

*B. Enforceability of the Indemnification Agreement Under the Governmental Tort Claims Act*

■ ¶ 22 Wagoner County argues that it cannot be held liable for indemnity because the action against Wagoner County is based on negligence and it is entitled to immunity under the Governmental Tort Claims Act. Wagoner County focuses on the Plaintiffs' underlying claim against it which, admittedly, sounds in tort. KTUL's crossclaim against Wagoner County, however, is a contract action to enforce an indemnity agreement.

■ ¶ 23 A governmental entity is not entitled to immunity from contractual claims. In *State Board of Public Affairs v. Principal Funding Corp.*, 1975 OK 144, ¶ 11, 542 P.2d 503, 505–06, the Oklahoma Supreme Court held as follows:

> We find no justifiable reason why the State should secure to itself the benefits of a contract without assuming the corresponding liabilities. In our opinion the doctrine of sovereign immunity should not be applicable in cases where State has entered into a valid contract and an individual or entity seeks redress for breach of the State's contractual obligations. We hold that where a person or entity enters into a valid contract with the proper State officials ..., the State has consented to being sued and waived its governmental immunity to the extent of its contractual obligations and such contractual obligations may be enforced against the State in an ordinary action at law....

Despite Wagoner County's attempts to characterize this action as a tort action, it is nonetheless an action to enforce a provision of the lease agreement between Wagoner County and KTUL. By entering into the lease agreement, Wagoner County has consented to being sued and waived its gov-

ernmental immunity to the extent of its contractual obligations, including the contractual obligation of indemnity to KTUL.

¶ 24 To further support its argument, Wagoner County relies on 51 O.S. Rev. Supp. 2005 § 155(27), which provides that "a political subdivision shall not be liable if a loss or claim results from ... [a]ny claim or action based on the theory of indemnification or subrogation." We interpret this provision as prohibiting liability against a political subdivision if the claim is based on implied, or noncontractual, indemnity;[3] it does not give a political subdivision immunity from indemnity that is bargained for and specifically included in a contract. As the Supreme Court stated in *State Board*, there is "no justifiable reason why [Wagoner County] should secure to itself the benefits of a contract without assuming the corresponding liabilities." *See State Board*, 1975 OK 144 at ¶ 11, 542 P.2d at 505.

¶ 25 The trial court did not err in holding that Wagoner County is not immune from KTUL's contractual claim of indemnity.

*C. Agency*

¶ 26 Both Wagoner County and KTUL appeal the trial court's finding, as a matter of law, that the lease agreement created an agency relationship with KTUL as the principal and Wagoner County as the agent. The effect of this ruling was to allow Wagoner County's negligence to be imputed to KTUL.

¶ 27 An agency relationship will not be presumed, and the burden of proving the existence, nature and extent of the relationship ordinarily rests on the party asserting it. *Enterprise Mgmt. Consultants, Inc. v. State ex rel. Okla. Tax Comm'n*, 1988 OK 91, ¶ 5, 768 P.2d 359, 362. "An agency relationship generally exists if two parties agree one is to act for the other.... An essential element of an agency relationship is that the principal has some degree of control over the conduct and activities of the agent." *McGee v. Alexander*, 2001 OK 78, ¶ 29, 37 P.3d 800,

807 (citation omitted). "The parties' status is revealed by considering the intent and effect of the contractual language in conjunction with the parties' actual conduct." *Enterprise*, 1988 OK 91 n. 12, 768 P.2d at 362.

¶ 28 In *Enterprise*, the Oklahoma Supreme Court considered whether contract language alone would support a finding of an agency relationship. There, the Citizen Band Potawatomi Tribe of Oklahoma contracted with Enterprise Management Consultants, Inc. (EMCI), to construct and operate a bingo facility on tribal land. EMCI protested the assessment of state and city sales taxes against it, arguing that, in its bingo and concession activities, it was merely acting as the Tribe's agent. In support of its defense, EMCI presented as evidence only the management agreement, a lease, a sublease, two advertising fliers, and the Tribe's constitution. The Court held that these documents did not establish the essential characteristics of an agency relationship—a fiduciary duty owed by EMCI to the Tribe and an agreement by EMCI to be subject to the Tribe's control. *Id.* at ¶ 6, 768 P.2d at 362.

The writings by themselves fail to establish agency; they leave the precise legal status in a clouded or inconclusive state. The contractual arrangements reveal no more than amorphous notions compatible both with franchisor-franchisee or an independent contractor relation. EMCI needed to go one step further and show that the factual interaction revealed an agency relation. This could have been done by demonstrating the Tribe's control in two important areas—control over the finances of the bingo operation and the Tribe's exclusive control of the revenue collected from the bingo and concession sales. Because there is no evidence in this record dehors the inconclusive written arrangements to prove EMCI's status as the Tribe's agent, we must hold that EMCI has failed to show that it was the Tribe's

---

**3.** "Noncontractual or equitable indemnity is similar to common-law contribution; one who is only constructively or vicariously obligated to pay damages because of another's tortious conduct may recover the sum paid from the tortfeasor." *National Union Fire Ins. Co. v. A.A.R. Western Skyways, Inc.*, 1989 OK 157, ¶ 8, 784 P.2d 52, 54 (quoting *Travelers Ins. Co. v. L.V. French Truck Serv. Inc.*, 1988 OK 76 n. 16, 770 P.2d 551).

agent in the operation of the bingo games and concession sales.

*Id.* at ¶ 7, 768 P.2d at 363 (emphasis omitted).

¶ 29 A tenant is generally not considered an agent of the landlord unless made so by specific agreement. *Killinger v. Iest,* 91 Idaho 571, 428 P.2d 490, 494 (1967); *Denver Tramway Corp. v. Rumry,* 98 Colo. 24, 52 P.2d 396, 398 (1935). "[A] landlord is not deemed to be the principal of his tenant merely because of the landlord-tenant relationship; and he is not responsible for the tenant's torts, nor for the tenant's failure to keep the premises reasonably safe and in good repair." *Stephenson v. Warner,* 581 P.2d 567, 568 (Utah 1978).

¶ 30 In the case at bar, the trial court focused on KTUL's right to control under the lease agreement, stating the "contract speaks for itself" and "is extremely specific and onerous of how it asserts rights to control every act or non act of anybody using their tower." Because KTUL reserved the right to control who had access to the tower and the right to inspect Wagoner County's equipment for safety, the trial court held that Wagoner County became a "de facto agent" of KTUL, and KTUL became responsible for Wagoner County's actions. Nevertheless, the trial court also recognized that KTUL did not exercise all those rights. It stated, "This is a case of which [KTUL] exercised complete and total authority *if they so desired* over Wagoner County," and the "contractual agreement shows that [KTUL] exercised unbelievable control and authority over everything [Wagoner County] did out there or ... *had the authority to.*" (Emphasis added.)

¶ 31 We recognize that the lease agreement reserved to KTUL certain rights: for example, to approve and evaluate Wagoner County's equipment and determine its compatibility with the tower design; to "restrict certain individuals or companies from performing [Wagoner County's] maintenance services on the Leased Property," so as to "maintain the integrity of the operations of [KTUL, Wagoner County] and other Tower tenants"; and to approve plans and specifications for changes and alterations to Wagoner County's equipment.

¶ 32 The lease agreement also placed certain obligations on Wagoner County: to provide KTUL with certain information related to frequencies upon request; to properly install and maintain its equipment; to keep its equipment "in a locked cabinet so as to be rendered inaccessible to unauthorized persons;" to ground its transmission lines to the tower; to comply with certain construction and maintenance requirements to keep the tower safe; to refrain from interfering with communications activities of KTUL and other lessees; to obtain necessary licenses or permits; to provide five days' notice to and receive approval from KTUL before performing installation or routine maintenance work on the tower; and upon termination of the lease, to surrender possession of the property in a condition as good as it was received, reasonable wear and tear excepted.

¶ 33 However, as in *Enterprise,* there is no showing of any factual interaction between KTUL and Wagoner County that revealed an agency relation. There is no evidence that KTUL and Wagoner County actually agreed to form an agency relationship. In fact, KTUL and Wagoner County both vehemently deny that such a relationship exists. Furthermore, there is no evidence that they impliedly agreed to form an agency relationship. They entered into an agreement for Wagoner County to lease property from KTUL. There is nothing to show that they also intended for Wagoner County to act as KTUL's agent.

¶ 34 Evidence that KTUL exercised actual control over Wagoner County is also lacking. KTUL did not exercise control over Wagoner County's installation or maintenance of the cabinet. The rights that the agreement reserved to KTUL and the obligations to which Wagoner County agreed relate to control over Wagoner County's use of the property for communication purposes. While the lease is somewhat different from a lease of an apartment, for example, it is similar in that it places obligations on Wagoner County as the lessee to coexist with the lessor and other lessees. At the same time, it gives KTUL as the lessor certain rights of control so as to maintain the ability of KTUL and

other lessees to use the tower for its intended purpose. Nonetheless, their rights and obligations under the lease do not as a matter of law make KTUL the principal of Wagoner County.

¶ 35 The trial court erred in concluding as a matter of law, based solely on the lease agreement, that an agency relationship existed. There is no evidence to support a finding that Plaintiff has met the elements to prove (1) that KTUL and Wagoner County entered into an agency relationship, and (2) that KTUL had the right, or actually exercised the right, to control the actions of Wagoner County other than those actions inherent in a landlord-tenant relationship. Consequently, the trial court erred in imputing Wagoner County's negligence to KTUL and thus making KTUL liable for compensatory and punitive damages due to Wagoner County's actions.[4]

## KTUL'S APPEAL

*A. Expert Testimony*

¶ 36 KTUL argues that the trial court erred in allowing Todd Sharp to testify as an expert witness for Plaintiffs because he was not qualified and because the prejudicial nature of his testimony outweighed its probative value.

¶ 37 Arguing that Todd Sharp was not qualified, KTUL emphasizes that Sharp had never testified or been qualified before any court in the United States as an expert witness, and he holds a degree in general business, not in engineering or industrial safety. "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness *qualified as an expert by knowledge, skill, experience, training or education* may testify in the form of an opinion or otherwise." 12 O.S.2001 § 2702 (emphasis added). The criteria for qualification of an expert witness are listed "in the disjunctive and qualification may be shown in any one or more of the five ways listed."

*Sharp v. 251st Street Landfill, Inc.,* 1996 OK 109, ¶ 14, 925 P.2d 546, 551.

¶ 38 "The qualification of an expert witness is generally within the sound discretion of the trial court, and the trial court's determination will not be disturbed absent an abuse of discretion." *Williams Natural Gas Co. v. Perkins,* 1997 OK 72, ¶ 17, 952 P.2d 483, 489. "An abuse of discretion occurs when a court bases its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling." *Christian v. Gray,* 2003 OK 10, ¶ 43, 65 P.3d 591, 608. "It is discretion employed on untenable grounds or for untenable reasons, or a discretionary act which is manifestly unreasonable." *Id.* at ¶ 44, 65 P.3d at 609 (quoting *Patel v. OMH Med. Ctr., Inc.,* 1999 OK 33, ¶ 20, 987 P.2d 1185, 1194).

¶ 39 At trial, Todd Sharp testified that he is employed by Tractel, Inc. (a manufacturer of fall protection equipment), as general manager for the training division, where he works as "the expert troubleshooter" for material handling, suspended chapel, and fall protection rescue. Sharp is also a consultant to companies in the "tower industry" and the National Association of Tower Erectors regarding tower safety, and he assisted with drafting telecommunications tower standards for the North Carolina Department of Labor. He asserted that he is recognized in his field as an expert in fall protection. He has worked with fall protection and rescue since the 1980s and, at the time of trial, had been working specifically in the tower industry for four years.

¶ 40 Acknowledging that no established written standards exist in the tower industry, Sharp testified from his knowledge and experience about the best working practices in the industry. He observed that there is not enough mandatory training and certification of climbers and that the best working practice in the tower industry is for companies to make sure "that anybody that accesses a structure has proof of the proper training and safety programs." According to Sharp,

---

4. The punitive damages award cannot stand because it cannot be imputed to KTUL, and the trial court determined that Wagoner County is entitled to immunity on Plaintiffs' claims against it.

it is incumbent on the owner of a tower "to be responsible for the people that access [the] tower [because it] is obviously an extremely unsafe atmosphere or working place if it is accessed in the wrong manner." Discussing safety training for working at heights, Sharp stated that making people aware of "drop hazards on structures" is important, so he talks "about the velocity that objects fall and the damage they can do." He stresses in his courses "that everything that goes up the structure must be secured [so] that nothing has the potential to fall off," because "something that falls two hundred, three hundred feet that you wouldn't think of as a hazard becomes a hazard in a hurry at those heights." Also discussed in the training courses is how wind velocities vary at different heights on a tower structure.

¶ 41 Based on Sharp's description of his current work experience, his history, and the courses that he teaches, he was qualified by knowledge, skill, and experience to testify as an expert witness on tower safety. The trial court did not abuse its discretion in allowing him to testify.

¶ 42 Also regarding the argument that Sharp was unqualified, KTUL argues that Sharp was allowed to testify regarding Wagoner County's negligence in accessing the equipment cabinet and the inadequacy of the lease agreement between KTUL and Wagoner County. KTUL's characterization of Sharp's testimony in these areas is unfair. Sharp's testimony regarding repair of the equipment cabinet related to his opinion that tower safety requires being aware of your surroundings and avoiding "drop hazards." His testimony regarding the lease agreement related to his opinion that the owner of the tower is responsible for who accesses the tower. The trial court did not err in allowing Sharp to testify on these subjects.

■ ¶ 43 KTUL argues that the trial court misled KTUL into believing that it would not allow Sharp to testify as an expert witness, by stating in a hearing immediately before trial that Sharp was not "an expert witness that falls within *Daubert.*" We agree with the trial court's assessment that Sharp's testimony was not subject to *Dau-*

*bert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because "a *Daubert* inquiry will be limited to circumstances where the reliability of an expert's method cannot be taken for granted" or where the expert evidence is novel. *Christian,* 2003 OK 10 at ¶ 11, 65 P.3d at 599–600 (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Harris v. State,* 2000 OK CR 20, ¶¶ 8–9, 13 P.3d 489, 492–93). Sharp's testimony was not novel, nor were his methods of evaluation extraordinary. *See Cline v. DaimlerChrysler Co.,* 2005 OK CIV APP 31, ¶ 28, 114 P.3d 468, 476–77. Furthermore, the trial court stated that, although Sharp's testimony had limited tangential value, the court would allow the testimony and would allow both sides to present their testimony by direct and cross-examination. It is clear from these and other statements in the record that the trial court intended to allow Sharp to give expert opinion testimony.

■ ¶ 44 In arguing that the trial court should have excluded Sharp's testimony, KTUL proposes that the prejudicial effect of Sharp's testimony outweighed its probative value. 12 O.S. Rev. Supp.2005 § 2403. In making this argument, KTUL is really arguing that Sharp's testimony was of little assistance to the jury because it related to common-sense issues. This does not fairly characterize Sharp's testimony in that he testified regarding tower industry practices and the need to be aware of the dangers of "drop hazards." While this testimony may have some common-sense elements, it also related to industry safety concerns, and the trial court did not err in allowing this testimony.

### B. Sufficiency of the Evidence of KTUL's Negligence

■ ¶ 45 KTUL argues Plaintiffs did not present sufficient evidence to submit the claim of negligence against KTUL to the jury. KTUL, in essence, is arguing that the trial court erred in overruling its motion for a directed verdict. Appellate review of a denial of motion for directed verdict is *de novo,* requiring reversal only if there is "an

entire absence of proof on a material issue." *Computer Publ'ns, Inc. v. Welton*, 2002 OK 50, ¶ 6, 49 P.3d 732, 735. An appellate court will regard as true all evidence favorable to the non-moving party, as well as all reasonable inferences that may be drawn from the evidence, and will disregard all evidence favorable to the moving party. *Id.*

¶ 46 Sharp testified that a tower owner has the responsibility to insure that persons accessing the tower are trained in tower safety, including training on how to access and exit the tower and how to work on the tower so as to recognize and deal with potential hazards. Sharp testified that Decedent's death was caused by KTUL "not regulating the people that had the ability to access their structure ... because they didn't ensure that whoever accessed their structure was very competent and very trained in working at extreme heights."

¶ 47 KTUL's actions, or inactions, regarding lack of training by those accessing the tower was confirmed by Dale Rhinehart, the Wagoner County deputy sheriff who ascended the tower to repair the communications equipment housed in the cabinet. He testified that he had no training regarding accessing a tower or safety requirements on a tower. When Rhinehart called KTUL to gain access to the tower, the KTUL employee with whom he spoke did not ask him about his training or competency to be on the tower or about what kind of work he would be doing there. KTUL did not speak with him after the work was completed to determine what work he had done or how he had accomplished it. KTUL'S general manager testified that he relied on Wagoner County to send responsible people up the tower. During the period of time that Wagoner County did the repair work, S & K Structural Services, Decedent's employer, was working on the tower for KTUL.

¶ 48 Viewing this evidence in the light most favorable to Plaintiffs, there is sufficient evidence that KTUL failed to require Wagoner County to use competent, trained individuals to conduct its work on the tower; that KTUL had knowledge that Wagoner County accessed the tower to conduct repair work; that KTUL did not confirm the type

of work or the quality of work that Wagoner County performed on the tower; and that KTUL knew S & K would be performing work on the tower after Wagoner County had performed its work. There is also evidence that a tower owner such as KTUL has the responsibility to make sure that persons accessing the tower are competent and trained. The trial court did not err in overruling KTUL's motion for a directed verdict.

## C. Indemnity for KTUL's Negligence

¶ 49 KTUL argues that Wagoner County must indemnify it for damages arising out of its own negligence. KTUL reasons that "[a]ny negligence of KTUL ... would be entirely dependent on the negligence of the Wagoner County Sheriff's Department," because "[i]f the County had not been negligent, [KTUL] could not be found liable."

¶ 50 An agreement which would have the effect of indemnifying one against its own negligence is strictly construed. *Fretwell v. Protection Alarm Co.*, 1988 OK 84, ¶ 12, 764 P.2d 149, 152. To be enforceable, such an agreement must be "*unequivocally clear* from an examination of the contract." *Id.* at ¶ 12, 764 P.2d at 153 (emphasis added).

¶ 51 The agreement between KTUL and Wagoner County clearly does not anticipate indemnity in favor of KTUL for its own negligence. The agreement provides that Wagoner County "shall indemnify and defend [KTUL] against any claim for damages, liability, costs, or expenses, including attorney's fees, *arising out of any breach by [Wagoner County]* of its warranties, representations, or covenants under this Lease." (Emphasis added.) Not only does the indemnity clause not mention KTUL's negligence; it does not make it "unequivocally clear" that the parties intended to provide for indemnity against KTUL's own negligence.

¶ 52 KTUL attempts to circumvent this general rule by arguing that its negligence was passive not active. We disagree with KTUL's argument. We first note that KTUL's negligence, as shown by the evidence discussed above, cannot be viewed as

merely passive. Also, the active/passive distinction has not been recognized by the Oklahoma Supreme Court.

¶ 53 Furthermore, the cases from other jurisdictions upon which KTUL relies are factually distinguishable from the case at bar. In *Harvey Machine Co. v. Hatzel & Buehler, Inc.*, 54 Cal.2d 445, 6 Cal.Rptr. 284, 353 P.2d 924 (1960), a business owner hired contractors to construct a new industrial plant. The contract between the parties included an indemnity provision in which the contractors agreed to indemnify the business owner "against liability … for bodily or personal injuries … sustained by any person or persons … and arising from the use of the premises, facilities, or services of [the business owner], its officers or employees." *Id.* 6 Cal.Rptr. 284, 353 P.2d at 926. While working on the plant, an employee of one of the contractors fell into an open elevator pit. The California Supreme Court noted that the business owner did not continue to maintain independent operations on the premises during the construction project; the injuries did not result from some conduct that was unrelated to the contractor's performance; the business owner's alleged breach of duty was passive negligence (breach of the general duty owed by a landowner); and the misconduct did not relate to some matter over which the business owner exercised exclusive control. Because the contractors had practical control of the structures on the premises, the Court concluded that "any negligence for the condition of the structures would obviously not be that of the owner alone" and the accident "was one of the risks, if not the most obvious risk against which [the business owner] sought to be covered." *Id.* 6 Cal. Rptr. 284, 353 P.2d at 927.

¶ 54 The facts of *Harvey Machine* are distinguishable from the case at bar. Here, KTUL continued to maintain its own operations on the tower, including hiring S & K Structural to work on the tower; KTUL's conduct was more than passive; and Wagoner County did not exercise exclusive control over the tower. Significant, too, is the differ-

ence in the language in the indemnity agreements: the agreement in *Harvey Machine* was very broad while the agreement in the case at bar was limited to indemnity for claims arising out of Wagoner County's breach of its warranties, representations, or covenants under the lease. For similar reasons, *Safeway Stores, Inc. v. Massachusetts Bonding & Insurance Co.*, 202 Cal.App.2d 99, 20 Cal.Rptr. 820 (Cal.Ct.App.1962), and *Estes Co. v. Aztec Constr., Inc.*, 139 Ariz. 166, 677 P.2d 939 (App.1983), are distinguishable.

¶ 55 The trial court did not err in determining that KTUL is not entitled to indemnity for its own negligence.

### D. S & K Structural Services' Negligence

¶ 56 KTUL requested the trial court to instruct the jury to determine the negligence, if any, of S & K Structural Services, Decedent's employer. KTUL points to evidence that Decedent was not properly "tied off" with both "a positioning lanyard and a fall arrest lanyard" and that he may not have been using his safety equipment correctly. According to KTUL, this evidence "could indicate a failure to train and supervise [Decedent] correctly" or "to provide him the proper equipment." However, KTUL points to no evidence regarding the training that S & K provided or failed to provide to Decedent; nor does KTUL show any evidence in the record that S & K failed to provide Decedent with the appropriate safety equipment. The trial court did not err in refusing to instruct the jury on S & K's negligence.

### E. Attorney Fees

¶ 57 Under the indemnity agreement, the trial court awarded to KTUL attorney fees and costs that it incurred prior to the time that Wagoner County assumed KTUL's defense. KTUL argues that it is also entitled to reimbursement of fees and costs incurred in retaining independent counsel after that time, because there was a conflict of interest between KTUL and Wagoner County.[5]

---

5. KTUL alleges that Wagoner County's defense of KTUL was "at best, half-hearted," because Wagoner County "sought first and foremost to defend

the County from any charge of negligence on its part and allowed the blame to be placed instead on KTUL."

¶ 58 KTUL is not entitled to reimbursement of fees incurred in hiring independent counsel because KTUL was defending against allegations of negligence. In *Barsness v. General Diesel & Equipment Co.*, 422 N.W.2d 819 (N.D.1988), a church leased a crane from General Diesel. One of the church's employees sued General Diesel for injuries he sustained in an accident while using the crane; General Diesel brought a third-party action against the church for contractual indemnity. The jury's verdict found that the plaintiff was one percent negligent, General Diesel was two percent negligent, and the church was ninety-seven percent negligent. General Diesel then sought indemnity for the attorney fees it had incurred in retaining separate counsel. The North Dakota Supreme Court concluded that General Diesel was not entitled to indemnity for its attorney fees because the agreement did not provide for indemnity against its own negligence. The Court held that "an indemnitee who defends against its own negligence may not recover attorney's fees because '[a]ny other rule would be not only unworkable, but would be inconsistent with the general rule that tort defendants, even if vindicated, must pay for their own defense.'" *Id.* at 827 (quoting *Conrad v. Suhr*, 274 N.W.2d 571, 578 (N.D.1979)). *See also Westinghouse Elec. Corp. v. Dade County*, 472 So.2d 866 (Fla.Dist.Ct.App.1985); *Byron Jackson Co. v. Woods*, 41 Cal.App.2d 777, 107 P.2d 639 (1940).

¶ 59 As in *Barsness*, the agreement in the case at bar did not provide for indemnity against KTUL's own negligence. Therefore, KTUL is not entitled to attorney fees it independently incurred in defending against Plaintiffs' allegations of negligence against it. "Where an indemnitor is not contractually obligated to indemnify an indemnitee's negligence then it is not liable for attorney's fees or other costs of defense." *Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 815 (Tex.1994). To hold otherwise would leave Wagoner County "liable for a cost resulting from a claim of negligence which [it] did not agree to bear." *Id.*

## CONCLUSION

¶ 60 With regard to Wagoner County's appeal, the trial court did not err in granting judgment for contractual indemnity to KTUL for damages arising from Wagoner County's negligence. Nor did the trial court err in determining that Wagoner County is not entitled to immunity on KTUL's claim of contractual indemnity. The trial court did, however, err in finding the existence of an agency relationship as a matter of law when there is no evidence to support a finding that KTUL and Wagoner County entered into an agency relationship or that KTUL had the right, or actually exercised the right, to control the actions of Wagoner County other than those actions that are inherent in the landlord-tenant relationship.

¶ 61 Regarding KTUL's appeal, the trial court did not err in allowing Plaintiffs' expert to give opinion testimony; nor did the trial court err in overruling KTUL's motion for a directed verdict or in denying its request to submit to the jury the issue of negligence of Decedent's employer. Nor did the trial court err in rejecting both KTUL's claim of indemnity for its own negligence and its claim of entitlement to attorney fees incurred in defending itself against Plaintiffs' claims of negligence.

¶ 62 The judgment against Wagoner County and in favor of KTUL for indemnity is affirmed; to the extent the judgment imputes Wagoner County's conduct to KTUL, the judgment is reversed. The judgment against KTUL, as it relates to KTUL's own negligence, is affirmed.

¶ 63 AFFIRMED IN PART AND REVERSED IN PART.

GOODMAN, J., and REIF, J. (sitting by designation), concur.