COLBERT, J.
 

 ¶1 This is a wrongful death action arising from a fatal vehicle/train collision at the County Road 1660 railroad crossing in Pontotoc County. The appellant, Burlington Northern and Santa Fe Railroad Company (BNSF), appeals from the underlying judgment on a jury's verdict in favor of the appellee, Juanita Nye, in her capacity as the wife of Jeffrey Nye, the decedent, and the personal representative of her husband's estate (Nye). BNSF also appeals the post-trial order overruling its motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial. In substance, BNSF contends that federal law preempted Nye's claims, challenges the fairness of the trial proceedings and challenges the amount of damages awarded. Having retained the appeal, this Court now considers the propriety of the jury verdict/award and examines the trial court proceedings below.
 

 I. BACKGROUND
 

 ¶2 A more detailed discussion of the disputed facts is provided in the context of the issues presented in section III,
 
 infra
 
 . On December 29, 2008, Jeffrey Nye (Driver), and his friend H.C. Rackley (Passenger), were transporting feed troughs in a trailer attached to Driver's jeep when a train, operated by BNSF, collided with Driver's jeep. Upon impact, the jeep flipped around behind the trailer and turned over. Driver and Passenger were ejected. Driver later died from his injuries. Passenger, although injured, survived.
 

 ¶3 At the time of the collision, the County Road 1660 railroad crossing was described as a "passive grade crossing"
 
 [1]
 
 equipped with at
 
 *868
 
 least one crossbuck sign-the familiar black-and-white, X-shaped sign that reads "RAILROAD CROSSING."
 

 ¶4 On October 29, 2009, Passenger sued BNSF, the train crew and Nye for negligence. Passenger ultimately settled his claims. On October 30, 2009, Nye's mother and representative of Nye's estate, filed an answer and a wrongful death cross-claim against BNSF and the train crew for negligence, intentional conduct for maintaining inadequate warning devices at the railroad crossing, failure to clear the right-of-way of vegetation and other obstructions, and failure to sound the train's horn. Ultimately, Juanita Nye, Jeffrey Nye's wife, was substituted as plaintiff and personal representative of Nye's estate.
 

 ¶5 BNSF denied Nye's allegations and raised several defenses, including contributory negligence, negligence per se for failing to yield the right-of-way to a plainly visible approaching train at the crossing and asserted that Nye's claim of inadequate warning devices was federally preempted.
 

 ¶6 In due course, BNSF filed various pretrial motions. One of the motions argued that federal law preempted several of Nye's claims, including the contention that BNSF failed to install adequate warning signs at the railroad crossing. Nye opposed the requested relief and raised the existence of disputed material facts regarding whether federal funds actually paid for the crossing signs at this particular intersection. In addition, Nye alleged that BNSF's evidentiary materials were insufficient to demonstrate that federal funds were actually used in the erection of the warning signs at the subject crossing. The trial court found that there was an overwhelming factual dispute concerning whether the warning signs at the subject crossing were federally funded and denied BNSF's motion.
 

 ¶7 BNSF immediately filed an application to assume original jurisdiction and writ of prohibition, seeking review by this Court. BNSF and Nye re-urged their respective arguments made below. During oral presentation of the matter, BNSF admitted, however, that it did not have proof that the specific crossbucks at issue, here, were erected with federal funds. Further, in its brief, BNSF only claimed immunity from damages under Nye's warning device claim but not immunity from suit. This Court denied BNSF's requested relief, essentially leaving resolution of the disputed facts for a jury's determination.
 

 ¶8 BNSF filed a subsequent motion in limine in the trial court to prevent Nye from introducing evidence and arguments related to their alleged preempted warning device claim. The trial court denied BNSF's motion. BNSF then moved for a ruling in limine to exclude consideration of BNSF's net worth and financial wealth. The trial court granted that motion.
 

 ¶9 On December 2, 2013, the parties tried the case to a jury. Nye produced several fact witnesses and expert testimony that the train was not plainly visible from the road. Various witnesses testified that the view of the subject crossing was obstructed by overgrown vegetation, trees and brush. Neither Driver nor Passenger noticed the approaching train until Driver slowed down and drove onto the railroad crossing. It was not until Driver yelled "train," one second before impact, that Passenger became aware of the impending collision.
 

 ¶10 Through multiple fact witnesses, Nye contended that BNSF never sounded the train's horn. In furtherance of this contention, Nye produced analysis of the train's event data recorder that the horn was not blown. BNSF refuted this claim.
 

 ¶11 On December 17, 2013, the jury returned an 11-1 verdict, finding BNSF and Nye negligent and apportioned 65% fault to BNSF and 35% fault to Nye. The jury awarded $14,813,000 in damages. On April 21, 2014, the trial court entered judgment on the jury's verdict and reduced the jury's award for Nye's contributory negligence to $9,628,450 in damages and $1,103,471.19 in prejudgment interest and costs for a total award of $10,731,921.19 plus post-judgment interest. BNSF, through its own legal strategies, decided not to seek a remittitur.
 

 ¶12 Subsequently, BNSF filed a Motion for Judgment Notwithstanding the Verdict (JNOV), and Alternative Motion for New
 
 *869
 
 Trial on July 14, 2014. The trial court entered its order overruling BNSF's motion on July 21, 2014. BNSF then filed this appeal. Nye answered contending essentially that the jury verdict/award should be upheld. This Court retained the appeal.
 
 [2]
 

 II. STANDARD OF REVIEW
 

 ¶13 BNSF's complained errors are nothing more than a futile attempt at a re-trial by appellate brief. Its approach to the numerous questions of material fact presented below is to deem each of them conclusively established as a matter of law and therefore beyond the purview of the jury as the finder of fact. The gravamen of BNSF's appeal is two-fold: (1) whether BNSF is entitled to judgment as a matter of law, or whether instead, the trial court properly submitted the factual issues to the jury; and (2) whether, under the evidence presented, the measure of damages awarded was reasonable.
 

 ¶14 When legal actions have been tried to a jury and judgment entered therefrom, this Court is constrained to review the jury's verdict as conclusive to all disputed facts and conflicting statements if "there is any competent evidence reasonably tending to support the verdict."
 
 Barnes v. Okla. Farm Bureau Mut. Ins. Co.
 
 ,
 
 2000 OK 55
 
 , ¶ 3,
 
 11 P.3d 162
 
 , 166 ;
 
 see
 

 also
 
 ,
 
 Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.
 
 ,
 
 1997 OK 7
 
 , ¶ 3,
 
 933 P.2d 282
 
 , 287. In a jury-tried action:
 

 an appellate court's duty is not to
 
 weigh the evidence
 
 and determine which side produced evidence of greater weight, i.e. it is not an appellate court's function to decide where the
 
 preponderance of the evidence lies
 
 -that job in our system of justice has been reposed in the jury. In a jury-tried case, it is the jury that acts as the exclusive arbiter of the credibility of the witnesses. Finally, the sufficiency of the evidence to sustain a judgment in an action of legal cognizance is determined by an appellate court in light of the evidence tending to support it, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it.
 

 Id.
 

 (emphasis added). Thus, "[w]here competent evidence was presented at trial to support reasonable findings as to those material fact questions relating to the claim in suit and no reversible error is otherwise shown, an appellate court must affirm a judgment based on a jury verdict...."
 
 Badillo v. Mid Century Ins. Co.
 
 ,
 
 2005 OK 48
 
 , ¶ 3,
 
 121 P.3d 1080
 
 , 1088. Stated another way-neither the trial court nor this Court will sit as thirteenth juror and substitute its opinion for that of a jury merely because the court could have decided or viewed disputed material fact questions differently.
 
 See
 

 Currens v. Hampton
 
 ,
 
 1997 OK 58
 
 , ¶ 9,
 
 939 P.2d 1138
 
 , 1141. Those general principles control our review here.
 

 ¶15 On appeal, BNSF re-urges the challenges raised in its motion for JNOV. The appellate standard for reviewing the trial court's ruling on a motion for JNOV is identical to the standard utilized by the trial court.
 
 See
 

 First Nat'l Bank in Durant v. Honey Creek Entm't Corp.
 
 ,
 
 2002 OK 11
 
 , ¶ 8,
 
 54 P.3d 100
 
 , 103. "We consider as true all evidence favorable to the non-moving party together with all inferences that may be reasonably drawn therefrom, and we disregard all conflicting evidence favorable to the moving party."
 

 Id.
 

 A motion for JNOV will not be granted unless there is an entire absence of proof on a material issue.
 

 Id.
 

 We reiterate, we are guided by those principles here.
 

 III. DISCUSSION
 

 A. BNSF's Preemption Defense
 

 ¶16 The background and purpose of the federal law relating to the Railroad Safety Act of 1970 (FRSA), codified at
 
 49 U.S.C. § 20101
 
 (2000),
 
 et
 

 seq.
 
 , was to promote "safety in every area of railroad operations and reduce railroad-related accidents and incidents."
 

 Id.
 

 § 20101. The FRSA also directed the Secretary of Transportation to address safety problems at grade crossings and "prescribe
 
 *870
 
 regulations and issue orders for every area of railroad safety."
 

 Id.
 

 § 20103(a).
 
 [3]
 

 ¶17 In 1973, the Federal Highway Safety Act (FHSA), which created the Federal Railway-Highway Crossings Program (the Crossings Program)
 
 23 U.S.C. § 130
 
 (2012 & Supp. 2015), made federal funds available to participating States for improvements and elimination of hazards at railroad grade crossings. Essentially, a State's receipt of federal aid was conditioned upon a State "conduct[ing] and systematically maintain[ing] a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish[ing] and implement[ing] a schedule of projects for this purpose."
 
 23 U.S.C. § 130
 
 (d). In addition, federal aid was conditioned upon a State's compliance with certain standards prescribed in the Federal Highway Administration's Manual.
 
 See
 
 23 C.F.R. § § 646, 655, 924.
 

 ¶18 The United States Supreme Court and the Tenth Circuit hold uniformly that when federal funds pay for the installation of warning devices at a railroad crossing-that is, when a State participates in a Crossing Program-the FRSA
 
 [4]
 
 and its regulations
 
 *871
 
 preempt any state law tort claim challenging the
 
 adequacy
 
 of those signs and crossbucks as a matter of law.
 
 Norfolk S. Ry. Co. v. Shanklin
 
 ,
 
 529 U.S. 344
 
 , 352-54,
 
 120 S.Ct. 1467
 
 ,
 
 146 L.Ed.2d 374
 
 (2000) (citing CSX Transp., Inc. v. Easterwood,
 
 507 U.S. 658
 
 , 670-71,
 
 113 S.Ct. 1732
 
 ,
 
 123 L.Ed.2d 387
 
 (1993) ) (emphasis added). The standards for preemption are stringent.
 
 CSX Transp.
 
 ,
 
 507 U.S. at 658
 
 ,
 
 113 S.Ct. 1732
 
 . But, there is a presumption against a regulation's preemptive effect.
 

 Id.
 

 at 658-59
 
 ,
 
 113 S.Ct. 1732
 
 .
 

 ¶19 This Court extensively discussed the U.S. Supreme Court's stringent preemption rationale behind the FRSA and ultimately delineated guidelines for determining the point in time (i.e. what constitutes federal participation) when state law actions challenging the adequacy of railroad crossing devices are preempted in
 
 Akin v. Mo. Pac. R.R. Co.
 
 ,
 
 1998 OK 102
 
 ,
 
 977 P.2d 1040
 
 .
 
 [5]
 

 ¶20 Upon certiorari review, this Court examined Congress's intent to preempt and stated:
 

 Before pre-emption, the public is protected by a railroad's state common-law duty of care. After installation of federally mandated warning devices, the public is protected by those devices. A plan to install devices and federal approval of a plan do not protect the public, however. The Railway's interpretation that federal approval triggers pre-emption would leave the public unprotected between the time of approval and the time the prescribed devices are installed and operating. This can be a substantial period of time.... To encourage prompt installation of federally prescribed
 
 *872
 
 warning devices, a railroad's common-law duty of care must continue until those devices are installed.
 

 Id.
 
 ¶ 27,
 
 977 P.2d at 1050
 
 . Applying a common sense rationale, this Court concluded that short of installing fully-funded operational, warning devices as a precondition to triggering preemption, the public would be bereft of either state or federal law protection for the period between federal approval and actual warning device installation.
 
 See
 

 id.
 
 ¶ 28,
 
 977 P.2d at 1051
 
 . Surely, Congress did not intend for a "no man's land" to exist at grade crossings for an indefinite amount of time, during which the public is protected neither by the federally mandated or approved warning devices nor by judicial recourse for injuries sustained by their absence.
 
 Id.
 
 ¶ 31,
 
 977 P.2d at 1053
 
 . In so concluding, it was error for the trial court to preempt the widow's inadequate signalization claim
 
 sans
 
 forensic combat that the crossing consisted of federally funded operational warning devices.
 
 See
 

 Akin
 
 ,
 
 1998 OK 102
 
 ,
 
 977 P.2d 1040
 
 . Simply put-the railroad failed to establish the critical elements of the preemption defense as a matter of law.
 

 ¶21 This Court's landmark holding in
 
 Akin
 
 is clear: A railroad cannot avail itself of a regulation's preemptive effect over a state tort claim that the signs, markings and warning devices protecting a crossing were inadequate, unless the railroad can
 
 first demonstrate
 
 that federally funded warning devices were installed and operational before the accident occurred.
 
 Id.
 
 ¶ 31,
 
 977 P.2d at 1053
 
 . Our pronouncement in
 
 Akin
 
 , conforms to extant Supreme Court jurisprudence.
 
 Id.
 
 ¶ 30,
 
 977 P.2d at 1052
 
 . Here, BNSF seeks to avail itself of the preemption defense against Nye's inadequate signalization claim. As County Road 1660 was a passive, or "crossbuck-only," crossing, the pivotal issue, here, is whether federal funds participated in the installation of the crossbucks.
 

 ¶22 The record reveals the existence of a Crossbuck Project Agreement from 1978 to 1980. The standard specifications of the agreement required participating railroad crossings to install two crossbucks. At trial, conflicting evidence was introduced concerning the funding source of the warning signs at the subject crossing. Nye introduced evidence that the characteristics of the crossbucks did not comply with the standard specifications required to participate in the federal program. Specifically, the federally funded project required two crossbucks to be placed at every crossing. Yet, a factual dispute existed (among others) as to whether one or two crossbucks were installed and whether the crossbucks were installed during the federal program. It is undisputed that the federal funds project was completed on February 29, 1980. But, four years following its completion, the Oklahoma Department of Transportation (ODOT) had yet to receive any information from the railroad as to whether or where federally funded crossbucks had been installed. Furthermore, testimony revealed that the crossing inventory from the United States Department of Transportation did not indicate the expenditure of federal funds on the subject crossing as the crossing was only equipped with one crossbuck from 1970 to 1987 which was seven years after the deadline for completion of the federal program.
 

 ¶23 BNSF introduced the testimony of two witnesses: Hal Hofener, a retired ODOT engineer; and Ernest Wilson, a former employee of BNSF's predecessor. Mr. Hofener testified that he oversaw the rail crossing program implemented after the passage of the FRSA and the FHSA. Yet, Mr. Hofener was unable to affirm that he had personal knowledge about the crossings; testified that he never visited the subject crossing and admitted that not all crossings in Pontotoc County contained federally funded warning signs. Mr. Hofener also swore by affidavit that the subject crossing only had one crossbuck but later testified that he was mistaken and that the subject crossing had two crossbucks. The jury also heard testimony that Mr. Hofener, a fact witness, was billing BNSF between $125 to $175 an hour throughout the litigation. The other witness, Mr. Wilson, testified that he neither could recall the subject crossing nor had any personal knowledge about the crossing. In addition, Mr. Wilson refused to testify as to the amount he was being paid for his testimony.
 

 *873
 
 ¶24 It was uncontested that if the crossbucks were in fact installed after February 29, 1980, the crossbucks could not have been part of the federally funded project. But, there was an evidentiary gap linking FHSA's approval and funding of the federal project to the specific crossing at issue here. So, before BNSF could successfully avail itself of a preemption defense, BNSF had the burden to demonstrate, as a matter of law, that the warning signs erected at County Road 1660 were federally funded.
 
 Id.
 
 ¶ 31,
 
 977 P.2d at 1053
 
 . Considering all the evidence and the parties' testimony, the trial court concluded that material facts existed as to whether federal funds participated in the installation of the warning devices; and, thus, properly submitted this matter to the jury.
 

 B. Train Visibility and Audible Horn
 

 ¶25 Although not stated precisely, the essence of BNSF's challenge is that Nye's failure to yield the right-of-way to an approaching train unequivocally constitutes negligence per se and, therefore, insulates BNSF from the legal consequences of its own lack of due care, if any. In support, BNSF relies upon
 
 Hamilton v. Allen
 
 ,
 
 1993 OK 46
 
 ,
 
 852 P.2d 697
 
 , and contends that Nye's alleged negligence per se entitles BNSF to judgment as a matter of law. We disagree.
 

 ¶26 The elements of negligence per se are three-fold: (1) the violation of a statute must have caused the injury, (2) the harm sustained must be of the type intended to be prevented by the statute and (3) "the injured party must be one of the class intended to be protected by the statute."
 
 Ohio Cas. Ins. Co. v. Todd
 
 ,
 
 1991 OK 54
 
 , ¶ 9,
 
 813 P.2d 508
 
 , 510.
 

 ¶27 Oklahoma law,
 
 Okla. Stat. tit. 47, § 11-701
 
 , requires any motorist approaching a railroad grade crossing to stop within fifty feet but not less than fifteen feet from the nearest rail of the railroad crossing. Section 11-701(A)(4) imposes a duty upon motorists to yield the right-of-way to a
 
 plainly visible
 
 approaching train
 
 within hazardous proximity
 
 to a railroad crossing.
 
 [6]
 
 Although the testimony reveals that Nye did not yield the right-of-way to BNSF, Nye defends that the train was not plainly visible, that overgrown vegetation concealed the train and the crossbuck, and that BNSF never sounded its horn to warn of its impending approach.
 

 ¶28 In
 
 Hamilton
 
 , this Court held that a motorist was negligent per se in violating section 11-701 only if the motorist's negligence directly and proximately caused the injury.
 

 Id.
 

 ¶¶ 11, 15
 
 ,
 
 852 P.2d at 699-700
 
 . It was uncontested that the "flasher warning of the approaching train was on and that the crossing gate was lowered."
 
 Id.
 
 ¶ 11,
 
 852 P.2d at 699
 
 . In addition, it was uncontested that the plaintiff had a wide angle view of the train, the train tracks and that two other vehicles were stopped in front of the closed gate in front of the tracks.
 
 Id.
 
 ¶¶ 3, 4,
 
 852 P.2d at 698
 
 . The plaintiff, however, stopped briefly, crossed the center line into the oncoming traffic lane, drove past the two stopped cars and around the crossing gates.
 
 Id.
 
 ¶ 4,
 
 852 P.2d at 699
 
 . Before the plaintiff's
 
 *874
 
 vehicle cleared the tracks, the plaintiff was struck by the approaching train.
 

 Id.
 

 ¶29 In finding the plaintiff negligent per se, we stated "[t]he general rule is that 'the causal connection between an act of negligence and an injury is broken by the intervention of a new, independent and efficient cause which was neither anticipated nor reasonably foreseeable.' "
 
 Id.
 
 ¶ 13,
 
 852 P.2d at
 
 700 (citing Thompson v. Presbyterian Hosp., Inc.,
 
 1982 OK 87
 
 ,
 
 652 P.2d 260
 
 ). We reasoned that a motorist, nearing a railroad crossing, "must yield the right-of-way to an approaching train, and the operator of the train can assume the vehicle will obey the law."
 

 Id.
 

 But, because the railroad could not have anticipated that the plaintiff would disregard the statute, ignore the train's warnings and attempt an unsafe crossing, the plaintiff was negligent per se and the plaintiff's negligence directly and proximately caused his injuries.
 

 Id.
 

 ¶30 Here, it is uncontested that the subject railroad crossing was a passive grade crossing, equipped with at least one crossbuck. But, conflicting evidence was introduced as to the visibility of the train, condition of the subject crossing and the crossbucks. Nye introduced evidence to demonstrate that the overgrown vegetation concealed the view of the crossbucks and the train by more than 90%. Video evidence was introduced demonstrating that a motorist's approach to the subject crossing was obstructed by trees and brush making it difficult to see a train inasmuch as a driver traveling 15 mph could not react in time to stop. Passenger testified that neither he nor Driver was aware of the approaching train until one second before impact. Nye also introduced expert and lay witness testimony that the County Road 1660 crossing was dangerous and put all drivers at risk. BNSF, on the other hand, attempted to refute Nye's claim by introducing photographic evidence of the subject crossing. Despite BNSF's contention that
 
 Hamilton
 
 is analogous to the action here, we find
 
 Hamilton
 
 patently, factually distinctive.
 

 ¶31 The facts necessary to determine a motorist's liability under section 11-701 in this case are directly in dispute. Whether Driver violated § 11-701(A), and thus, is negligent per se, turns on whether the train was "plainly visible" when Driver approached the railroad crossing. The United States Court of Appeals for the Tenth Circuit recently analyzed the "plainly visible" issue in
 
 Ross v. Burlington N. & Santa Fe Ry. Co.
 
 ,
 
 528 Fed.Appx. 960
 
 (10th Cir. 2013), which we find instructive.
 
 [7]
 

 ,
 

 [8]
 
 In
 
 Ross
 
 , whether the plaintiff violated § 11-701(A)(4) turned "on whether the train was 'plainly visible' when he approached the railroad crossing."
 

 Id.
 

 Because Oklahoma precedent had yet to define "plainly visible" under this statute, the Tenth Circuit turned to Texas case law noting this Court had previously analyzed § 11-701(A) using Texas case law on an identical statute.
 

 Id.
 

 at 963 (citing Akin, ¶ 42,
 
 977 P.2d at
 
 1055 )(discussing Snodgrass v. Ft. Worth & Denver Ry. Co.,
 
 441 S.W.2d 670
 
 (Tex.Civ.App.1969) ). Utilizing the same parameters this Court previously employed, the Tenth Circuit found that "a train is not 'plainly visible' ... unless a reasonably prudent person,
 
 *875
 
 situated as was the motorist and exercising ordinary care for his own safety, should have seen it."
 

 Id.
 

 Such an objective test is consistent with our long-standing jurisprudence that a motorist should "exercise the care an ordinarily prudent person would use for his own safety in the same situation and circumstances...."
 
 Missouri-Kansas-Texas RR. Co. v. Harper
 
 ,
 
 1970 OK 77
 
 , ¶ 13,
 
 468 P.2d 1014
 
 , 1019.
 
 [9]
 

 ¶32 According to Nye, the "plainly visible" issue is further compounded by BNSF's alleged failure to adequately clear the brush, trees, debris and otherwise maintain the railroad's right-of-way. Oklahoma law imposes a duty on railroads to maintain "the reasonable abatement at public crossings of trees, shrubs and other obstructions within or encroaching within a sight triangle." Okla. Admin. Code 165:32-1-11(b). The regulation, 165:32-1-11(b), is instructive. The sight triangle is described as having a,
 

 beginning point from the center point of the main track and the center point of the grade crossing extending along the center of the street or roadway approach for a distance of 50 feet or to the railroad right-of-way property line, whichever is less, then extend at an angle until arriving at a point on the center of the main track 250 feet from the original beginning point.
 

 OAC 165:32-1-3.
 

 ¶33 The parties presented conflicting evidence regarding the visibility of the train within the sight triangle. Passenger testified that there were multiple trees obstructing the crossing. In addition, many local witnesses testified that trains using the subject crossing were not plainly visible. For instance, Joseph Harrison, a life long resident who lived off of County Road 1660 for the majority of his life testified that "[y]ou can't really see through the trees" and that "[y]ou've got to get past the trees to be able to see." Deanna Jo Peterson, a fourteen-year resident testified that she "didn't allow [her three children] to go either direction on [County Road 1660] because of the safety of the crossing." Further, Dr. Kenneth Heathington, Nye's expert witness testified that the crossing was essentially blind and that at least 90% of the crossing was obstructed. According to Heathington, "[i]n my opinion as an engineer, [County Road 1660] is certainly an extra-hazardous crossing." The expert opined that the subject crossing put reasonable drivers at risk. Although BNSF presented photographic evidence of the crossing, the jury did not find that BNSF's evidentiary materials compelled the conclusion that the train was "plainly visible."
 

 ¶34 BNSF faired no better in defending Nye's claim that BNSF failed to sound an audible warning. BNSF presented testimony from its three crew member team that they met their responsibility to sound the train's horn at the crossing. However, BNSF's event data recorder indicated that no horn was blown. BNSF claimed that the reason the event data recorder indicated no horn was blown was because the horn was
 
 *876
 
 not connected to the event data recorder. Although BNSF presented testimony to the contrary the trooper on the scene testified that he was told by a railroad employee that there was no event data recorder on the train. Further, during the trial, the wrong event data recorder was presented for the jury's inspection. BNSF did not provide the correct event data recorder until the last day of trial.
 

 ¶35 Nye presented evidence that directly contradicted BNSF's assertions that the horn was blown. Passenger testified that, with his window rolled down half-way, he was "110 percent sure" that the train did not sound its horn. Further, several witness testimonies revealed that BNSF only sounded the train's horn "[a]bout half the time." Joseph Harrison, a resident local traveling in the vehicle behind Nye testified that he was the first person at the scene of the accident, beating even the train crew members who were walking about from the nose of the train. With his windows rolled down, Harrison stated that he did not hear the train sound its horn even though his vehicle was positioned behind Nye. He further testified that based on his past experiences, the location of his vehicle would have enabled him to hear an audible horn had it been blown. Many other local residents testified that trains did not always sound their horns when using the crossing in question. And, a thirty-three year resident, testified that "if [she] heard a train coming and [her children] were leaving [the house] at the same time, [she] would call the school to make sure they made it."
 

 ¶36 The purpose of abating vegetation and sounding the horn, especially at a passive railroad crossing, is to maintain proper visibility and to warn motorists of an approaching train-neither of which were established here. The facts necessary to determine a violation of section 11-701, along with the issue of proximate cause and whether BNSF gave an audible warning of its impending approach were directly in dispute. The question of proximate cause is for the jury where there is competent evidence demonstrating that a motorist was not warned of a train's impending approach.
 
 Hamilton
 
 ,
 
 1993 OK 46
 
 , ¶ 17,
 
 852 P.2d at 700
 
 (quoting Missouri-Kansas-Texas Railroad Co. v. Baird,
 
 1962 OK 82
 
 ,
 
 372 P.2d 847
 
 ). Thus, resolution of those issues were squarely within the jury's purview.
 
 Id.
 
 ¶ 16,
 
 852 P.2d at 700
 
 . Even if one assumes that Nye was negligent, this Court has long espoused the view that a railroad's liability is not eradicated unless the motorist's negligence was the proximate cause of the injuries.
 
 Akin
 
 ,
 
 1998 OK 102
 
 , ¶ 36,
 
 977 P.2d at 1054
 
 .
 

 ¶37 Here, there was sufficient evidence presented at trial from which a reasonable jury could find under the circumstances that the train was not plainly visible. Thus, Nye's negligence, as determined by the jury, was not sufficient to break the causal chain and consequently was not the proximate cause of his injuries. We agree and find the existence of "competent evidence reasonably tending to support the verdict."
 
 Barnes
 
 ,
 
 2000 OK 55
 
 , ¶ 3,
 
 11 P.3d at 166
 
 . To reiterate, this Court will not disturb a trial court's judgment entered upon the jury's resolution of factual disputes, witness credibility and the weight and value allocated to a witness' testimony where there is any competent evidence reasonably tending to support the verdict.
 
 See
 

 Pine Island RV Resort, Inc. v. Resort Mgmt., Inc.
 
 ,
 
 1996 OK 83
 
 , ¶ 18,
 
 922 P.2d 609
 
 , 613.
 

 C. Counsel's Alleged Misconduct
 

 ¶38 BNSF next contends that Nye's counsel engaged in misconduct thereby prejudicing the jury against BNSF; and thus, resulted in a "grossly excessive verdict." Specifically, BNSF challenges Nye's counsel's statements surrounding (1) the existence and treatment of the train's event data recorder and (2) BNSF's financial wealth.
 

 ¶39 A counsel's conduct is "a matter to be left largely within the discretion of the trial judge."
 
 Middlebrook v. Imler, Tenny & Kugler M.D.'s, Inc.
 
 ,
 
 1985 OK 66
 
 , ¶ 33,
 
 713 P.2d 572
 
 , 584 (citations omitted).
 
 See also
 

 Currens
 
 ,
 
 1997 OK 58
 
 , ¶ 2,
 
 939 P.2d at 1140
 
 . The litmus test for attorney misconduct then, is whether "counsel's remarks result[ed] in actual prejudice" as adjudged by the trial court.
 
 Id.
 
 ¶ 33,
 
 713 P.2d at 584
 
 (citations omitted). Ordinarily, a reviewing court will not reverse based upon alleged
 
 *877
 
 attorney misconduct unless such conduct "substantially influences the verdict or denies the defendant a fair trial."
 

 Id.
 

 1. Opening / Closing Statements
 

 ¶40 BNSF contends Nye's counsel made inflammatory statements during his opening and closing remarks. Specifically, BNSF claims that Nye made "accusations" that BNSF tampered with the train's event data recorder, argued during the opening statement that "lots of things went on with this that are strange" and asserted during closing argument that "you can change the data ..." from the train's event data recorder. "Attorneys have wide latitude in opening and closing statements, subject to the trial court's control, and limitation of the scope of the arguments is within the trial court's discretion."
 
 Covel v. Rodriguez
 
 ,
 
 2012 OK 5
 
 , ¶ 22,
 
 272 P.3d 705
 
 , 714. It must appear that substantial prejudice resulted from the counsel's alleged misconduct in his/her argument to the jury "and that the jury was influenced thereby to the material detriment of the party complaining[ ]" "[i]n order for the alleged misconduct to effect a reversal of the judgment...."
 

 Id.
 

 (citing Okla. Turnpike Auth. v. Daniel,
 
 1965 OK 7
 
 , ¶ 13,
 
 398 P.2d 515
 
 , 518 ). "[A]n admonition to the jury to disregard an improper argument cures any prejudice [possibly] created thereby since it cannot be presumed as a matter of law that the jury will fail to heed the admonition given by the court."
 
 Middlebrook
 
 ,
 
 1985 OK 66
 
 , ¶ 29,
 
 713 P.2d at 583
 
 .
 

 ¶41 In reviewing BNSF's allegations in toto, this Court must use a wide lens and survey the totality of the circumstances surrounding the trial. BNSF presented conflicting testimony on how the event data recorder was handled. At the accident scene, BNSF's witness first claimed to State Trooper McKee that the train did not have an event data recorder. BNSF later recanted and testified that the event data recorder (which did exist) was working properly. Yet, BNSF testified that the event data recorder was sent out for repair because it was not recording the horn. Upon examination, a subsequent report indicated the event data recorder neither had electrical issues nor was unplugged, although BSNF stated that the wires to the horn were not hooked up. Another BNSF witness testified that he "attempted," although unsuccessfully, to download the event data recorder on the night of the collision. It is undisputed that the event data recorder was successfully downloaded on the day following the incident. Yet, BNSF could not produce any record of the first attempted download, successful or not. Further, BNSF was unable to produce the actual event data recorder in question until the final day of trial, after several previous miscues. Finally, in contravention of its own protocol, BNSF's crew members did not provide statements to the investigating authority on the scene on the night of the wreck. These facts are definitely sufficient to create a justification for Nye's counsel to suggest during opening statement that "there's a lot of things that went on that were strange."
 

 ¶42 Next, there were multiple areas where differing testimonies were elicited as to whether the data from the event data recorder could be manipulated or misrepresented after the data was downloaded. Nye's expert, Jim Scott, testified unequivocally that the event data recorder's data could be manipulated. BNSF's witnesses generally testified that the downloaded data could not be manipulated, but acknowledged that subsequent representations of the data could vary. And, Nye's counsel highlighted the differences and conflicting evidence and testimonies regarding the same.
 

 ¶43 The jury is charged with judging the credibility and assessing the substance and demeanor of each witness. When witnesses from both sides rely on the same evidentiary materials but arrive at differing conclusions, resolution and interpretation of the factual dispute lies solely with the jury.
 
 See
 

 Covel
 
 ,
 
 2012 OK 5
 
 , ¶ 17,
 
 272 P.3d at 712
 
 .
 

 2. Motion in Limine
 

 ¶44 Finally, BNSF contends that Nye's counsel violated the trial court's order in limine by purposefully injecting BNSF's finances into the trial. BNSF complains that Nye's counsel asked a witness to confirm that BNSF had "$20 billion, with a 'B', in
 
 *878
 
 gross revenues," and elicited other allegedly prejudicial statements to show BNSF is "big and rich." Because punitive damages were not at issue, BNSF believes those statements prejudiced the jury. Nye defends that BNSF opened the door to this type of examination. We agree.
 

 ¶45 During opening statements and in presenting its case, BNSF made repeated references to its wealth and the millions of dollars spent on grade crossing programs. At Nye's counsel's request, the parties had a sidebar hearing, outside the jury's presence, on whether BNSF had opened the door and ushered in the topic of its corporate wealth. The trial court determined that BNSF had placed its wealth into evidence; and thus, permitted Nye's counsel to question the witnesses accordingly.
 

 ¶46 A motion in limine is a pretrial motion that serves to exclude prejudicial evidence from the jury's consideration.
 
 See
 

 Middlebrook
 
 ,
 
 1985 OK 66
 
 , ¶ 12,
 
 713 P.2d at
 
 579 (citing Bridges v. City of Richardson,
 
 163 Tex. 292
 
 ,
 
 354 S.W.2d 366
 
 (1962) ). A trial court's ruling in limine is speculative in effect, advisory in nature.
 

 Id.
 

 We have said:
 

 Rulings on the motion ... occur before the point at which the evidence would be admitted or rejected. The motion is therefore preliminary and advisory in nature until the point of trial at which the evidence would have been admitted but for the motion in limine. Only at such time can the trial judge finally determine if the questioned evidence is admissible considering the facts and circumstances of the case before him.
 

 Id.
 

 Therefore, a court may revisit its ruling during trial.
 
 See
 

 id.
 

 Also, a motion in limine is not one-sided. A party cannot seek an order in limine to restrain an opposing party on an issue and subsequently present that same issue for the jury's consideration. This Court admonished similar conduct in
 
 Middlebrook
 
 , stating that when an appealing party invites or provokes errors, that party is not entitled to "a reversal of judgment where it does not plainly appear that the verdict was influenced by the remarks."
 
 1985 OK 66
 
 , ¶ 31,
 
 713 P.2d at 584
 
 .
 

 ¶47 We reiterate, the "trial court is in a better position to appraise the fairness of a proceeding before it than can be gathered by a review of the record by the appellate court.... [T]he trial court is given a wide discretion and it will require a clear showing of manifest error and abuse of discretion before the appellate court will be justified in reversing."
 
 Wickham v. Belveal
 
 ,
 
 1963 OK 227
 
 , ¶ 19,
 
 386 P.2d 315
 
 , 320. Accordingly, we find no manifest error or abuse of discretion exists here.
 

 ¶48 Similarly, a motion for new trial upon the ground of improper conduct of counsel is addressed to the sound legal discretion of the trial court.
 
 See
 

 Middlebrook
 
 ,
 
 1985 OK 66
 
 , ¶ 33,
 
 713 P.2d at 584
 
 . The trial court must exercise its discretion in "accordance with the bounds of reason and recognized principles of law."
 
 Davis v. Sams
 
 ,
 
 1975 OK 157
 
 , ¶ 5,
 
 542 P.2d 943
 
 , 944. "Unless it appears that the trial court erred in some pure, simple question of law or acted arbitrarily, its judgment will not be distur[b]ed on appeal."
 

 Id.
 

 This Court holds that the record below is devoid of the requisite outrageous conduct that would rise to the level of reversible attorney misconduct.
 

 D. Jury's Verdict on Damages
 

 ¶49 BNSF'S next point of contention is a challenge to the damage award. Specifically, BNSF urges this court to reverse and remand arguing that the $14.8 million dollar verdict award was excessive and somehow resulted from passion, partiality or prejudice rather than the evidence presented. A jury verdict cannot be set aside as excessive unless it "strike[s] mankind, at first blush, as being beyond all measure unreasonable and show[s] the jury to have been activated by passion, partiality, prejudice or corruption."
 
 Dodson v. Henderson Properties, Inc.
 
 ,
 
 1985 OK 71
 
 , ¶ 6,
 
 708 P.2d 1064
 
 ,1066 (citing Austin Bridge Company v. Christian,
 
 1968 OK 138
 
 , ¶ 12,
 
 446 P.2d 46
 
 , 49 ). The issue of damages is left to the jury after hearing all the evidence.
 
 See
 

 Estrada v. Port City Prop., Inc.,
 

 2011 OK 30
 
 , ¶ 35,
 
 258 P.3d 495
 
 , 508. And, when the record supports the amount of damages awarded, we "will not invade the jury's province and substitute our
 
 *879
 
 judgment as a fact-finding tribunal."
 

 Id.
 

 This Court expects,
 

 substantial disparities among juries as to what constitutes adequate compensation for certain types of pain and suffering. This is a litigious fact of life of which counsel, clients and insurance carriers are fully aware. Once they place their fate in the hands of a jury, then they should be prepared for the result.... They cannot expect the Court to extricate them in all cases where the award is higher or lower than hoped for or anticipated.
 

 Vanskike v. Union Pacific R.R. Co.
 
 ,
 
 725 F.2d 1146
 
 , 1150 (8th Cir. 1984) (internal citations omitted).
 

 ¶50 Here, BNSF points to no specific evidence to support its claim that the jury decision was a result of bias, passion or prejudice beyond the assertion that the jury's award for non-economic damages far outweighed the amount of the uncontested economic damages. The economic damages agreed to by the parties in this case consisted of $813,516. Nye offered substantial evidence supporting a claim for non-economic damages-namely, the loss suffered by his wife and two daughters-coupled with the loss of the extensive support Nye's mother must now endure. BNSF neither refuted the non-economic loss Nye's family members suffered, nor proffered rebuttal evidence in this regard.
 

 ¶51 Oklahoma law provides for recovery of damages in wrongful death actions for:
 

 B. The damages recoverable in actions for wrongful death as provided in this section shall include the following: Medical and burial expenses, which shall be distributed to the person or governmental agency as defined in Section 5051.1 of Title 63 of the Oklahoma Statutes who paid these expenses, or to the decedent's estate if paid by the estate.
 

 The loss of consortium and the grief of the surviving spouse, which shall be distributed to the surviving spouse.
 

 The mental pain and anguish suffered by the decedent, which shall be distributed to the surviving spouse and children, if any, or next of kin in the same proportion as personal property of the decedent.
 

 The pecuniary loss to the survivors based upon properly admissible evidence with regard thereto including, but not limited to, the age, occupation, earning capacity, health habits, and probable duration of the decedent's life, which must inure to the exclusive benefit of the surviving spouse and children, if any, or next of kin, and shall be distributed to them according to their pecuniary loss.
 

 The grief and loss of companionship of the children and parents of the decedent, which shall be distributed to them according to their grief and loss of companionship.
 

 Okla. Stat. tit. 12, § 1053
 
 (B) (2010).
 

 ¶52 Following the jury's finding that BNSF was sixty-five percent negligent, the jury was allowed to compensate the spouse, children and parent of the decedent for loss of consortium, grief and loss of companionship pursuant to the Oklahoma statute. This Court finds that the jury was correctly instructed in Oklahoma law.
 

 ¶53 As a make-weight argument, BNSF claims that jury awards in other cases pale in comparison to the amount awarded in this case. BNSF points to two cases in support of the assertion that the verdict should be held legally excessive.
 
 Moody v. Ford Motor Co.
 
 ,
 
 506 F.Supp.2d 823
 
 (N.D. Okla. 2007) and
 
 Chicago, Rock Island & Pac. R.R. Co. v. Am. Airlines, Inc.
 
 ,
 
 1965 OK 190
 
 ,
 
 408 P.2d 789
 
 . Those cases are distinguishable from the present case because the court in each of them found punitive elements in the jury awards that were held as intended to punish the defendant or to send a message to the defendant. Here, there is no evidence that Nye attempted to send such a message. In fact, Nye's attorney never asked the jury to punish or send BNSF a message. The trial court specifically charged the jury here not to allow sympathy or prejudice to influence their decision and not to allow BNSF's annual gross income to weigh in, in the slightest degree.
 

 ¶54 BNSF also asserts that the proportional difference between the agreed upon economic damages Nye suffered (approximately $813,000), is evidence, in and of itself, that the non-economic damages awarded
 
 *880
 
 ($14,000,000) were excessive. BNSF simply contends that the discrepancy between the economic and non-economic damages demands a finding of bias, passion or prejudice. However, BNSF points to no statutory or case authority to support the proposition that the jury must adhere to some legal standard of proportionality between these two types of damages.
 
 [10]
 

 ¶55 BNSF cites five prior wrongful death actions to support its argument that the verdict in the current case amounted to an excessive damage award.
 
 See
 

 Moody
 
 ,
 
 506 F.Supp.2d 823
 
 (N.D. Okla. 2007) ;
 
 Covel
 
 ,
 
 2012 OK 5
 
 ,
 
 272 P.3d 705
 
 ;
 
 West v. Bd. of Cty. Comm'rs of Pawnee Co.
 
 ,
 
 2011 OK 104
 
 ,
 
 273 P.3d 31
 
 ;
 
 Currens
 
 ,
 
 1997 OK 58
 
 ,
 
 939 P.2d 1138
 
 ;
 
 Estate of King v. Wagoner Cty. Bd. of Cty. Commr's
 
 ,
 
 2006 OK CIV APP 118
 
 ,
 
 146 P.3d 833
 
 . Of these cases, only one did not affirm the trial court's award for the plaintiff,
 
 Moody
 
 , in which the trial court remanded for a new trial after the jury awarded a $5 million dollar verdict to plaintiff. The appellate court in that case held that the verdict demonstrated elements of a punitive nature and found serious misconduct by the plaintiff's attorney at trial.
 
 [11]
 
 However, those elements are not present in this action. This Court affirms the jury's determination of damages.
 

 E. Jury Instructions
 

 ¶56 Finally, BNSF challenges several of the trial court's instructions regarding the duties of a motorist at a railroad crossing. Those challenges, however, are warmed-over versions of BNSF's underlying complaints of error as discussed
 
 supra
 
 . Integral to the resolution of all of BNSF's jury challenges is this Court's decision in
 
 Bierman v. Aramark Refreshment Servs., Inc.
 
 ,
 
 2008 OK 29
 
 , ¶ 22,
 
 198 P.3d 877
 
 , 884-85. There, this Court held:
 

 [i]nstructions are explanations of the law of a case enabling a jury to better understand its duty and to arrive at a correct conclusion. When reviewing allegedly erroneous jury instructions, this Court must consider the instructions as a whole. We look to whether the instructions reflect the law on the relevant issue, not whether the instructions were perfect.
 

 Id.
 

 ¶57 This Court has carefully reviewed the challenged jury instructions, the Oklahoma Uniform Jury Instructions, and examined Oklahoma law. We find that each challenged instruction required resolution of a factual dispute to be determined by the jury and, if any error existed-syntax or otherwise-to be harmless. In examining the trial court's instructions as a whole and for the reasons expressed herein we find no reversible error.
 

 IV. CONCLUSION
 

 ¶58 After hearing the evidence, the jury resolved the conflict in favor of Nye. It is not the province of this Court to sit as thirteenth juror and supplant the determination of the trier of fact. Where there is competent evidence in the record reasonably tending to support a jury's verdict and the matter was submitted to the jury upon proper instruction fairly stating the applicable law, the judgment will not be disturbed. This Court's review of the entire record establishes that each disputed material issue of fact was correctly presented to the jury upon proper instruction. Finding that there is competent evidence to support the jury's verdict, we affirm the trial court's entry of judgment. Similarly, this Court affirms the trial court's denial of BNSF's motion for JNOV or in the Alternative Motion for a New Trial.
 

 JUDGMENT AFFIRMED.
 

 ALL JUSTICES CONCUR.
 

 [1]
 

 A "passive grade crossing" is a crossing that contains only "passive warning devices." According to
 
 23 CFR § 646.204
 
 (I), "passive warning devices" are defined as "those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train." In contrast, "active warning devices" are those:
 

 traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train.
 

 Id.
 

 § 646.204(j).
 

 [2]
 

 During the pendency of this appeal, BNSF filed a Motion for Oral Argument dated July 13, 2015. That motion is denied.
 

 [3]
 

 49 U.S.C.A. § 20103
 
 states:
 

 (a) Regulations and orders. The Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970. When prescribing a security regulation or issuing a security order that affects the safety of railroad operations, the Secretary of Homeland Security shall consult with the Secretary.
 

 (b) Regulations of practice for proceedings. The Secretary shall prescribe regulations of practice applicable to each proceeding under this chapter. The regulations shall reflect the varying nature of the proceedings and include time limits for disposition of the proceedings. The time limit for disposition of a proceeding may not be more than 12 months after the date it begins.
 

 (c) Consideration of information and standards. In prescribing regulations and issuing orders under this section, the Secretary shall consider existing relevant safety information and standards.
 

 (d) Nonemergency waivers. The Secretary may waive compliance with any part of a regulation prescribed or order issued under this chapter if the waiver is in the public interest and consistent with railroad safety. The Secretary shall make public the reasons for granting the waiver.
 

 (e) Hearings. The Secretary shall conduct a hearing as provided by section 553 of title 5 when prescribing a regulation or issuing an order under this part, including a regulation or order establishing, amending, or providing a waiver, described in subsection (d), of compliance with a railroad safety regulation prescribed or order issued under this part. An opportunity for an oral presentation shall be provided.
 

 (f) Tourist railroad carriers. In prescribing regulations that pertain to railroad safety that affect tourist, historic, scenic, or excursion railroad carriers, the Secretary of Transportation shall take into consideration any financial, operational, or other factors that may be unique to such railroad carriers. The Secretary shall submit a report to Congress not later than September 30, 1995, on actions taken under this subsection.
 

 (g) Emergency waivers.-
 

 (1) In general. The Secretary may waive compliance with any part of a regulation prescribed or order issued under this part without prior notice and comment if the Secretary determines that-
 

 (A) it is in the public interest to grant the waiver;
 

 (B) the waiver is not inconsistent with railroad safety; and
 

 (C) the waiver is necessary to address an actual or impending emergency situation or emergency event.
 

 (2) Period of waiver. A waiver under this subsection may be issued for a period of not more than 60 days and may be renewed upon application to the Secretary only after notice and an opportunity for a hearing on the waiver. The Secretary shall immediately revoke the waiver if continuation of the waiver would not be consistent with the goals and objectives of this part.
 

 (3) Statement of reasons. The Secretary shall state in the decision issued under this subsection the reasons for granting the waiver.
 

 (4) Consultation. In granting a waiver under this subsection, the Secretary shall consult and coordinate with other Federal agencies, as appropriate, for matters that may impact such agencies.
 

 (5) Emergency situation; emergency event. In this subsection, the terms "emergency situation" and "emergency event" mean a natural or manmade disaster, such as a hurricane, flood, earthquake, mudslide, forest fire, snowstorm, terrorist act, biological outbreak, release of a dangerous radiological, chemical, explosive, or biological material, or a war-related activity, that poses a risk of death, serious illness, severe injury, or substantial property damage. The disaster may be local, regional, or national in scope.
 

 [4]
 

 49 U.S.C.A. Section 20106 provides:
 

 (a) National uniformity of regulation.
 

 (1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
 

 (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order-
 

 (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
 

 (B) is not incompatible with a law, regulation, or order of the United States Government; and
 

 (C) does not unreasonably burden interstate commerce.
 

 (b) Clarification regarding State law causes of action.-(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party-
 

 (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;
 

 (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
 

 (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).
 

 (2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.
 

 (c) Jurisdiction. Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action.
 

 49 U.S.C.A. § 20106
 
 .
 

 [5]
 

 Akin
 
 , was a wrongful death action arising from a vehicle/train collision at a railroad crossing. The subject crossing was described as having "certain passive warning signs as well as crossbucks with flashing lights ... on both sides of the crossing ..." but lacked automatic gates.
 

 Id.
 

 ¶ 2
 
 ,
 
 977 P.2d at 1042
 
 . At the time of the collision, the warning lights were flashing to warn motorist of the train's impending approach.
 

 Id.
 

 Yet, the plaintiff's vehicle continued to approach the crossing and neither stopped nor slowed down.
 

 Id.
 

 The plaintiff's vehicle was struck by the approaching train and the plaintiff was instantly killed.
 

 Id.
 

 The widow commenced a wrongful-death action against the railroad and alleged that the warning lights had a history of malfunctioning; and therefore, the "motoring public had ceased to view the flashing lights as a serious and reliable warning of the imminent approach of a train."
 
 Id.
 
 ¶ 3,
 
 977 P.2d at 1042
 
 . Based on the faulty devices, the widow challenged the adequacy of the crossing's warning devices and alleged that "automatic gates were required in order to operate the crossing safely."
 

 Id.
 

 The railroad urged that the widow's "inadequate signalization theory" was federally preempted and successfully moved for an order in limine and partial summary adjudication.
 
 Id.
 
 ¶ 4,
 
 977 P.2d at 1043
 
 .
 

 [6]
 

 Okla. Stat. tit. 47, § 11-701
 
 states:
 

 A. Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
 

 1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;
 

 2. A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;
 

 3. A railroad train approaching within approximately one thousand five (1,500) hundred feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
 

 4. An approaching railroad train is plainly visible and is in hazardous proximity to such crossing; or
 

 5. The tracks at the crossing are not clear.
 

 B. No person shall drive any vehicle through, around or under any crossing gate or barrier at a railroad crossing while such gate or barrier is closed or is being opened or closed or fail to obey the directions of a law enforcement officer at the crossing.
 

 C. The operator of any Class A, B, or C commercial vehicle not required to stop at all railroad crossings, as prescribed in Section 11-702 of this title, shall slow down and check that the tracks are clear of an approaching train.
 

 [7]
 

 Tenth Circuit jurisprudence is "instructive in providing guidance on similar state law questions."
 
 Andrews v. McCall (In re K.P.M.A.)
 
 ,
 
 2014 OK 85
 
 , ¶ 35, Fn.8,
 
 341 P.3d 38
 
 , 50.
 

 [8]
 

 Consider the case of
 
 Cornwell v. Union Pac. R.R.
 
 ,
 
 2010 WL 3521668
 
 , where the court, in construing
 
 Okla. Stat. tit. 47, § 11-701
 
 (A), held that a crossing must have "a clearly visible electric or mechanical signal device which gives warning of the
 
 immediate approach of a railroad train
 
 or crossing gate is lowered or when a human flagman which gives or continues to give a signal of the approach or passage of a railroad train," to hold a driver's failure to heed those warnings negligent per se under the statute. But "reflectorized cross bucks which warn of train tracks, however, ... do not fall under these categories as they do not give an electronic or mechanic signal that warns that a train is immediately approaching." In cases of a passive grade crossing, or "crossbuck-only" crossing, evidence of obstruction is relevant to a plaintiff's defense of negligence per se.
 
 See
 

 Id.
 

 at 6 n.2 (N.D. Okla. Sept. 7, 2010), aff'd sub nom.
 
 Cornwell v. Union Pac. R.R. Co.
 
 ,
 
 453 Fed.Appx. 829
 
 (10th Cir. 2012). Consider also,
 
 Malinski v. BNSF Ry. Co.
 
 ,
 
 2017 WL 1294438
 
 (N.D. Okla. Mar. 31, 2017) (Where the court held that "evidence of obstruction is indeed relevant ... under the defense of negligence per se since an element of 47 O.S. § 11-701(A) is whether the 'approaching railroad train is plainly visible.' ").
 

 [9]
 

 In addition, this standard of care is supported by
 
 Moore v. Burlington N. R.R. Co.
 
 ,
 
 2002 OK CIV APP 23
 
 ,
 
 41 P.3d 1029
 
 . In
 
 Moore
 
 , the court held that the trial court erred by not giving the requested jury instruction, which stated:
 

 You are further instructed that a railroad track is of itself a warning of danger and one who attempts to cross it must exercise that degree of care which an ordinarily prudent person would exercise under like circumstances. As to what is ordinary care depends upon surrounding circumstances, but it must be such care as is commensurate with a known danger. Thus, if one attempts to cross a railroad track where his view is obstructed, he would be required to exercise a greater degree of care than he would if he were crossing a railroad track where there were no obstructions.
 

 Id.
 
 ¶ 9,
 
 41 P.3d at 1032
 
 . The court, however, noted that the instruction was based on evidence that "both parties had traveled the road and the railroad track many times and, therefore, knew the line of visibility up and down the track was limited."
 
 Id.
 
 ¶ 11,
 
 41 P.3d at 1033
 
 .
 

 Nothing, here, conclusively establishes a finding that Nye "had traveled the road and the railroad track many times" and "knew [that] the line of visibility up and down the track was limited." Although Passenger did not look for the presence of a train as a passenger under ordinary circumstances, he was not required to do so since there were no "conditions [present] that warranted a heightened level of responsibility" to put him on notice "
 
 before [he became] a passenger
 
 ."
 
 Snyder v. Dominguez
 
 ,
 
 2008 OK 53
 
 , ¶ 21,
 
 202 P.3d 135
 
 , 141. Thus, with no further evidence that Nye should have known of the danger, Nye's standard of care was that of what an ordinarily prudent person would have exercised under like circumstances.
 

 [10]
 

 The two cases Nye cites in its pleadings resulted in substantial non-economic damages for the plaintiffs. See the wrongful death case of
 
 Burke v. Jones
 
 ,
 
 2007 WL 906743
 
 (N.D. Okla.), where the jury awarded $20 million dollars; and the wrongful death case of
 
 Drews v. Gobel Freight Lines, Inc.
 
 ,
 
 144 Ill.2d 84
 
 ,
 
 161 Ill.Dec. 324
 
 ,
 
 578 N.E.2d 970
 
 (1991), where the jury awarded $8.3 million dollars.
 

 [11]
 

 The case of
 
 Estate of King
 
 is not on point with the current case, focusing instead on other issues. The other three cases cited held that, either the jury verdict was inadequate, as held in
 
 West
 
 , or that the jury verdict was not excessive, as held in
 
 Currens
 
 and
 
 Covel
 
 .